Argued at Pendleton October 26; reversed December 8, 1931; argued
on rehearing September 20, 1932; former opinion
adhered to January 31, 1933

# BAKER LOAN & TRUST CO. *v.* PORTLAND CATTLE LOAN CO., INC., ET AL.

(6 P. (2d) 36, 18 P. (2d) 599)

*Omar C. Spencer,* of Portland (Carey, Hart, Spencer and McCulloch, of Portland, on the brief), for appellant.

*Blaine Hallock,* of Baker (Nichols, Hallock and Donald, of Baker, on the brief), for respondent and defendant R. N. Stanfield.

BEAN, C. J. The history of the Portland Cattle Loan Company, Inc., and the transaction claimed to bear upon the same, is said to be about as follows: For a number of years prior to 1922, former United States Senator R. N. Stanfield had been engaged in the sheep business in Oregon and Idaho. His operations were carried on through various companies and partnerships, and not infrequently he would finance the business of an individual, taking his note secured by mortgage upon the sheep purchased. Large sums were borrowed from time to time by Mr. Stanfield from the two Portland companies, engaged at the time in sheep and other livestock financing: Portland Cattle Loan Company, an Oregon corporation (predecessor of the appellant Portland Cattle Loan Company, Inc., a Washington corporation), and the Columbia Basin Wool Warehouse Company. There were loans directly to the companies and partnerships controlled by Senator Stanfield, and, in other instances, notes running to Stanfield were indorsed over and the accompanying

chattel mortgage assigned, Stanfield remaining secondarily liable upon his indorsement. Included in the latter class of transactions was a note or notes for $20,-988.70, executed by John W. Densley in favor of Stanfield, secured by chattel mortgage on the Densley sheep. This note was indorsed and the mortgage assigned to the Columbia Basin Wool Warehouse Company.

When the post-war deflation in livestock values came, the two companies, the Portland Cattle Loan Company and the Columbia Basin Wool Warehouse Company, found themselves with wholly inadequate collateral for their Stanfield paper, and after some negotiation an agreement was reached between the two companies and Senator Stanfield, which provided for the following arrangement:

(a) An appraisal was made of all of the sheep and livestock back of the Stanfield loans, direct and indirect (including the Densley discounted notes), and the Portland Company paid the Columbia Basin Company one-half of the value thus ascertained and took over all interest of the Columbia Basin Company in the collateral securing its Stanfield paper.

(b) All of the Stanfield interests were placed in the hands of a trustee, John T. Updike, who was empowered to operate the different outfits through corporations to be organized or otherwise as he might determine, for the account of the Portland Company first since that company proposed to provide the additional funds for the operation, and then for the account of the Columbia Basin Company and other creditors, and finally for Senator Stanfield after the extinguishment of all indebtedness.

With the property thus acquired by the Portland Company was the John Densley note of $20,988.70, payable to Stanfield and indorsed by him to the Columbia Basin Company. The Densley sheep were appraised at $16,154.44, and the Portland Company was called upon to decide whether to foreclose and apply the proceeds on the Stanfield indebtedness or to renew the Densley paper, undertaking to make such further advances as might be necessary for continuing the Densley operation. The latter course was adopted. A new mortgage was taken from Densley, running to the Portland Company for $16,154.44, the appraised value of the sheep. The balance of the Densley indebtedness to Stanfield, whether on account of the large note or otherwise, was ascertained by Stanfield's representative, Miss K. N. Kivett, pursuant to a plan under which deficit notes of similarly situated growers were to be given to Stanfield and by him indorsed over to the trustee. In the case of Densley it was planned to secure, by a second mortgage on the sheep covered by the first mortgage, the note representing the balance of the indebtedness taken over from the Columbia Basin Company. This is referred to in the record as a Stanfield "equity." It was a balance over what was covered by the new first mortgage which, if worked out by Densley, would be available to the Portland Company in further reduction of the Stanfield indebtedness, as claimed by that company.

While Densley owed Stanfield other moneys in addition to the note indorsed to the Columbia Basin Company, the Portland Company and the trustee, Updike, were interested only in the balance of the $20,988.70 obligation over and above the amount of the new first mortgage, and, as claimed by the Portland Company,

the understanding was that a note representing this difference would be executed by Densley and secured by a second mortgage on the sheep covered by the newly executed first mortgage. Thereupon the Portland Company agreed to undertake the financing of the Densley sheep operation, evidently expecting to get back not only its advances for running expenses and the amount of the new first mortgage note but also the amount of the second mortgage note. The Portland Company asserts that without this incentive it is obvious that that company would have had no object in making further advances to Densley to finance his sheep operations. The sheep would have been sold at once and the proceeds applied on the Stanfield indebtedness.

Thus far, it is asserted in the briefs, there is very little, if any, dispute between the parties. The trustee, J. T. Updike, and the Snake River Valley Livestock Company, a corporation organized for the purposes of the trust, had an office on the ground floor of the Washington Hotel building in Weiser, Idaho. Senator Stanfield, at the same time, had an office presided over by Miss Kivett on an upper floor of the hotel building. It is claimed by the Portland Company that Miss Kivett, from the "upper office," advised the accountant from the "lower office," after months of computation and checking, that Densley should execute, in addition to the first mortgage note of $16,154.44, three additional notes in favor of Stanfield: one for $4,698.64, to be secured by a second mortgage on the same sheep, which mortgage was executed and dated February 1, 1923; one for $5,000; and one for $4,000, making a total of $13,698.64. Each of the latter notes were dated June 1, 1922. Immediately upon

their execution these notes were indorsed by Stanfield, one to the Bank of Echo, and one to the Bank of Stanfield, and the note for $4,698.64 was turned over to the trustee Updike. Later Densley organized the Eagle Valley Sheep Company and transferred his sheep business to that company. In July, 1925, Densley caused the Eagle Valley Sheep Company to execute a new note in favor of the Portland Company for $4,819.16 in renewal of the Densley note for $4,698.64. The renewal note was for a less amount on account of an error of $1,000 in the amount of the original note, as to which there is no dispute.

The Stanfield trust was terminated in January, 1925. The Densley note, with the other assets held by the trustee, was turned over to appellant, Portland Cattle Loan Company, Inc., which had succeeded to the rights of the old Portland Cattle Loan Company. When the Eagle Valley Sheep Company assumed the Densley obligation, its note was made directly to the Portland Cattle Loan Company, Inc. In October, 1925, the Eagle Valley Sheep Company undertook to pay off this indebtedness. Other moneys had been borrowed from the Portland Company, which increased the first mortgage indebtedness to $24,363.05, and the Eagle Valley Sheep Company proposed to pay off both obligations. Upon Stanfield's objection that the payment to cover the note of $4,819.16 was "payable to him for his account or for the account of certain other persons or corporations" the arrangement for the deposit of the money with plaintiff Baker Loan and Trust Company was made.

Defendant Mack claims the details of the transaction, pertaining to his note particularly, were as follows: In the year 1920 he loaned to R. N. Stanfield

the sum of $5,000, taking Stanfield's note for that amount and, as collateral behind Stanfield's obligation, a note of John W. Densley running to Stanfield and indorsed over to Mack for the amount of $5,000. Densley's obligation to Senator Stanfield was renewed from time to time subsequent to the year 1920, and in October, 1923, it was found that Densley did not owe Senator Stanfield, after receiving certain credits on account of sheep and wool sales, etc., an amount sufficient to justify the making of a renewal note in the sum of $5,000, but that such note should be only in the amount of $4,281.21, represented by the sum of $3,698.64, with accrued interest thereon from June 1, 1922, the last preceding renewal, to the date of the subsequent renewal note October 3, 1923. Mr. Mack held, at the time of the deposit of the fund referred to, Stanfield's note in the principal sum of $5,000, with Densley's collateral note in the principal sum of $4,281.21. This renewal note executed by Densley, along with others made at the same time, was secured by a mortgage executed October 3, 1923, by Densley. Mack claims the fund deposited by Densley to pay his obligation of $3,698.64, with interest thereon from June 1, 1922, aggregating $4,281.21 on October 3, 1923, with interest from that date.

When the transfer was made pursuant to the agreement of April 7, 1922, between the Columbia Basin Wool Warehouse Company and the Portland Cattle Loan Company, which was assented to by R. N. Stanfield, it is clear that the Portland Company held the notes of J. W. Densley for $20,988.70, payable to Stanfield and indorsed by him to the warehouse company as collateral to secure the payment of the notes of Stanfield to the warehouse company for a much larger

amount. The Densley sheep were appraised at $16,-154.44, for which a first mortgage on the sheep was given by Densley to secure the same. The appraised value of the sheep appears to have been considered by the parties as equivalent to a payment of that amount, but it was not sufficient to square the Densley indebtedness of $20,988.70. The transfer and adjustment, which involved several growers whose obligations Stanfield held and indorsed to the Portland Company, took some months, although it was made and the notes were dated as of June 1, 1922. After the status of Densley's accounts was ascertained, at least in part, a note in favor of R. N. Stanfield, dated June 1, 1922, for the sum of $4,698.64 was executed by John W. Densley. This note was indorsed without recourse by R. N. Stanfield, as he states, inadvertently, and transferred to John T. Updike, as trustee for the Portland Company, together with a large number of other notes. It was secured by chattel mortgage on 3,323 head of sheep, dated February 1, 1923, executed by Densley in favor of Stanfield, and was duly recorded. During 1922 the Densley sheep were sold and the proceeds duly credited. There seems to be but little attention paid to the security of the chattel mortgages to secure the so-called duplicate notes. On July 10, 1925, the note just mentioned, being unpaid, the Eagle Valley Sheep Company executed and delivered to the Portland Cattle Loan Company, Inc., its promissory note dated July 10, 1925, due October 9, 1925, in the sum of $4,819.16, which was secured by chattel mortgage executed and delivered to the Portland Company. This note was in lieu of the John W. Densley note of $4,698.64.

In the memorandum of agreement of April 7, 1922, executed and acknowledged by R. N. Stanfield for the

purpose of facilitating and insuring, as far as possible, the payment of his obligations to the Portland Company, he assigned and transferred to John T. Updike, trustee, and his successors, all his interest in the corporations, partnerships and individuals, whose mortgages are listed in Exhibits A and B to the agreement between the Portland Cattle Loan Company and the Columbia Basin Wool Warehouse Company, and the notes that he had made and indorsed or guaranteed, which were secured by said mortgages. John T. Updike, as trustee, was fully authorized to consolidate or merge the properties mentioned in the agreement

"with full power and authority * * * to make any and all necessary adjustments and agreements with any or all of the said mortgagors named in said Exhibits A and B to said last mentioned agreement for the purpose of ascertaining and agreeing upon the amount or amounts of any note or notes to be given by said mortgagors or any of them in lieu of any existing and outstanding note or notes listed in Exhibits A and B * * *."

Therefore, the trustee had full authority to take the note of J. W. Densley for $4,698.64 and to have the same renewed by the Eagle Valley Sheep Company on July 10, 1925, in the sum of $4,819.16.

Turning to Exhibit A of the agreement of April 7, 1922, between the Portland Company and the warehouse company, referred to, we find, together with other notes and mortgages listed amounting to $1,-721,140.32, the following item: "J. W. Densley, Richland, Oregon, United States National Bank, Portland, $20,988.70." Following the adjustment of the accounts, Senator Stanfield states that he came from Washington to Weiser for that purpose and indorsed and turned over the notes and securities mentioned, among

which was the Densley note which he did not notice and indorsed inadvertently, there being so many of them that he nearly had "writer's cramp." R. N. Stanfield having transferred the Densley note to the Portland Company, it was entirely proper for Mr. Updike to take the note and second mortgage from Densley for any balance over and above the amount of the appraised value of the Densley sheep, for which a note and first mortgage on the sheep had been executed by Densley, up to the amount of the Densley note of $20,988.70, indorsed by Stanfield to the Columbia Basin Wool Warehouse Company.

It should be borne in mind that the Densley note and first mortgage did not equal the $20,988.70, the amount assigned to the Portland Company by Stanfield. The Portland Company, through the trustee, advanced money to Densley for the purpose of purchasing and running a large number of sheep, after the sheep he had on June 1, 1922, had all been sold, and thereby assisted Densley to pay his indebtedness in full.

It is in accordance with equity that the Portland Company should have the benefit of the security which it enabled Densley to create. Densley was perfectly satisfied to pay the money to the Portland Company and did not know of any claim of Mack's until the litigation commenced.

The agreement between the warehouse company and the Portland Company, which was assented to by R. N. Stanfield, provided for the manner of conducting the business as follows:

"The Portland Company will not be obligated to but may advance or lend money to the mortgagors listed in Exhibit A, and may deal with them or any of them in its own discretion and without restriction

so far as this agreement is concerned, and without interference by the Warehouse Company or any of the holders of notes secured by the mortgages listed in Exhibit A, who have authorized the making of this agreement, and without any obligation to them or any of them whatsoever except as herein provided and as is provided in the contract of which Exhibit C is a copy, and may make such arrangements with R. N. Stanfield or with the said mortgagors or any of them for consolidation, merger or reorganization of them or any of them, whether as corporations, partnerships, or as individual outfits as the Portland Company may deem necessary or desirable for its own business; and it may have any or all of the mortgagors and their successors as often as it may require organize corporations, or partnerships, sell out or consolidate, or retire from business, enter into new business relations or continue in existing relations, all as may seem desirable or advantageous to the Portland Company or as may be able to agree upon with anyone interested at the time; * * *.''

This paragraph of that contract provided further that at the end of five years, if there remained any part of the notes of R. N. Stanfield unpaid, the warehouse company or any holders thereof might pursue such remedies for the collection thereof from the makers and endorsers, if any, as it might deem proper or necessary,

"not however asserting or claiming thereby any right or claim as to said notes of R. N. Stanfield prior or superior to the right or claims of the Portland Company, or its assigns, acquired under or in harmony with this agreement or the agreement between the Portland Company and R. N. Stanfield attached hereto and marked 'Exhibit C'.''

It is contended on behalf of Mack that the latter condition of the contract indicates that it was contemplated and understood at the time that there were

certain outstanding obligations of Senator Stanfield, by indorsement growing out of his transactions with growers, which were or could be "prior or superior to the right or claim of the Portland Company, or its assigns." It appears that clause was inserted for general direction and in the interest of the warehouse company or other holders of the notes of R. N. Stanfield.

The same contention is made in regard to a further stipulation to the effect that, if there is any lien or encumbrance prior to the mortgaged lien of the warehouse company affecting any of the property mortgaged in the mortgages listed in Exhibit A, the Portland Company should be protected against the same by the warehouse company. We fail to see that this provision has any bearing upon the question at issue.

Similar claims were made to the provision inserted in the contract between the Portland Company and Senator Stanfield, Exhibit F, as follows:

"Nothing contained in this agreement or in the said agreement between the Warehouse Company and the Portland Company of (or) the exhibits thereto shall deprive me of the right hereafter to question the correctness of the amount or amounts claimed to be due from me to the Warehouse Company and the Portland Company respectively by reason of my endorsement of or signature or guaranty upon the notes listed in said Exhibits A and B to said agreement. My liability to the holders of said notes for the R. N. S. face amounts thereof is not questioned."

This last quoted clause simply shows that the notes and mortgages listed in Exhibit A of the warehouse contract were transferred as collateral security and not as an additional liability of Mr. Stanfield. Mr. Stanfield does not and can not now claim any equity

in the note of the Eagle Valley Sheep Company or the money in question. As shown by the deposit agreement, Stanfield claimed "that said last named indebtedness, $4,819.16, is payable to him for his account or for the account of certain other persons or corporations." In any event he claims it "is payable to him." He mentions himself first and for his account before that of "certain other persons." Mack's name was not mentioned at the time the deposit agreement was made, and the memorandum does not indicate that there was any thought of him.

The note of Densley for the excess, $4,698.64, was not taken until some time after Densley's accounts had been adjusted and the balance ascertained, but like other similar transactions the note was dated June 1, 1922, at the same time the accountant for the trustee took two other notes of John W. Densley in favor of the Portland Cattle Loan Company, one for $5,000 and the other for $4,000. Upon the trustee's being informed by Miss K. N. Kivett, Mr. Stanfield's representative, that notes for the amounts for which these two notes were executed had been indorsed by Mr. Stanfield, one to the Bank of Echo and one to the Bank of Stanfield, and that the notes had been renewed by Densley in the "upper office" the trustee delivered the $5,000 note and the $4,000 note to Miss Kivett and took her receipt therefor, but kept the Densley note, $4,698.64, which was renewed by the Eagle Valley Sheep Company. A second chattel mortgage on 3,323 sheep and lambs was executed by Densley on February 1, 1923, to secure the last named note. This is said to have been after the sheep had been sold.

It is asserted on behalf of Mack that in March, 1920, Mack loaned to Stanfield the sum of $5,000 and

took as collateral security a note of John W. Densley running to Senator Stanfield in that amount indorsed by Stanfield.

Miss Kivett, as a witness for defendant Mack, testified in substance, as follows: That she, in representing R. N. Stanfield, worked from April 7, 1922, to about the middle of June, with E. F. Roy, who was employed with the trustee in checking over and working out and adjusting the accounts of the several growers; that after crediting Densley with the proceeds of the 1922 wool and an error, Densley owed Stanfield $12,-698.64, and notes were taken for this amount in favor of Stanfield, one for $5,000, one for $4,000, and one for $4,698.64, which, on account of the error, was $1,000 too large, the latter being endorsed to Mack, and that she informed Mr. Douglas, who was engaged in the office of the trustee, of the notes she had taken; that in October Densley renewed the three notes and gave a mortgage to secure them; that she first learned of the note in question on July 18, 1925, when Densley came to the "upper office" and was requested to renew his paper; that Densley said "I don't owe that much money. I have just signed some paper down stairs." They went to the "lower office" and she picked up the $5,000 and $4,000 notes, dated June 1, 1922, and tore the name of John W. Densley off of each note and informed the trustee that the two notes had been discounted to the Echo bank and Stanfield bank; that she searched through the office and could not find the other note.

Mr. A. W. Douglas, who handled the matter of taking the note of the Portland Cattle Loan Company and the second mortgage, and who was an expert accountant, testified to the effect that Miss Kivett did not

inform the office of the trustee of the three notes that John W. Densley had signed in Stanfield's office; that Miss Kivett told him notes were drawn up for $5,000 and $4,000, and that they were hypothecated, and as to the other note of $4,698.64, she had told him that was "all we may lay claim to as a Stanfield equity" inasmuch as the balance of it in the amount of $9,000 had been pledged; that the item of $4,698.64 was entered in the books of the trustee under "bills payable"; that the note and mortgage were prepared as soon as Densley was credited with the 1922 wool and the amount of the excess or equity was ascertained. On cross-examination he testified, in part, as follows:

"Q. What I want to know is this: Where did you get the information upon which you were able to adjust that Densley account and prepare the three notes there at that time; one in the amount of $4,000.00 and one for five thousand dollars and one for the amount of $4,698.64?

"A. From Miss Kivette. I was an absolute stranger to this and I knew nothing and if I hadn't been instructed I would have taken a second mortgage for the total amount, but being instructed I separated and segregated the nine thousand in any shape they wanted it drawn and that instruction was received from Miss Kivette.

"Q. I am interested in knowing why you prepared the three notes dated June 1st?

"A. Because I was asked to.

"Q. By Miss Kivette?

"A. Yes, sir."

It does not seem that the trustee would be keeping any of Densley's accounts, and the Portland Company would not have undertaken to finance Densley any further unless Stanfield, or his representative, had determined that there was a Densley balance to be

treated as a Stanfield "equity" and for which Densley had executed a note to be indorsed by Stanfield and delivered to the trustee. This was the basis of the transaction.

In October, 1925, when the Eagle Valley Sheep Company decided to pay its indebtedness, there was in the hands of the Portland Company a first mortgage note of $24,363.05; also a note for $4,819.16 (a renewal of the Densley note of $4,698.64), which was secured by a second mortgage upon the sheep of the Eagle Valley Sheep Company. The sheep company did not question its obligation to pay this second mortgage note. It was a valid and enforcible obligation of the Eagle Valley Sheep Company. The Portland Company was a holder thereof in due course for value: § 57-402, Oregon Code 1930. It took the note in good faith and for value.

██ Every negotiable instrument is deemed *prima facie* to have been issued for a valuable consideration, and every person whose signature appears thereon to have become a party thereto for value. An antecedent or preexisting debt constitutes value. Where value has at any time been given for the instrument, the holder is deemed a holder for value in respect to all parties who became such prior to that time: §§ 57-201, 57-202, 57-203, Oregon Code 1930; *American Nat. Bank v. Kerley,* 109 Or. 155 (220 P. 116, 32 A. L. R. 262).

Among the mass of collateral notes and mortgages assigned to the trustee by Mr. Stanfield, the only strange thing is that there were not more controversies. No one could be expected to remember all the details in regard to them. We do not criticize any one. We think the equities are with the Portland Cattle Loan Company, Inc., and the legal status of the note is in its favor.

The decree of the circuit court will be reversed and a decree will be entered directing that the fund deposited with the Baker Loan and Trust Company, being said sum of $4,851.02, with interest thereon at the rate of 3 per cent per annum from November 6, 1925, be paid over to the Portland Cattle Loan Company, Inc., after deducting therefrom the sum of $65 to be paid to the court reporter and $50 to be paid to plaintiff's attorney, and the sum of $11 as plaintiff's costs, as decreed by the circuit court, and that all of the defendants bear their own costs and disbursements in this court and the circuit court.

ROSSMAN and CAMPBELL, JJ., did not participate in the consideration of this case.

---

Former opinion adhered to on rehearing January 31, 1933

ON REHEARING

(18 P. (2d) 599)

*Charles A. Hart,* of Portland (Carey, Hart, Spencer & McCulloch, of Portland, on the brief), for appellant.

*Blaine Hallock,* of Baker (Nichols, Hallock & Donald, of Baker, on the brief), for defendant R. N. Stanfield and respondent H. H. Mack.

BEAN, J. This is a rehearing of an interpleader suit to determine the ownership of the fund of $4,851.02, with accumulated interest, in the possession of plaintiff. For an extended statement of the case see former opinion.

Among a large number of notes and assets turned over by R. N. Stanfield to the Portland Cattle Loan Company and to a trustee was one of John Densley in the amount of $20,988.70. This note was secured by a mortgage on the sheep. It was listed in Exhibit A to the agreement between the cattle company and Stanfield and the Columbia Basin Wool Warehouse Company. Pursuant to the agreement and understanding Densley's mortgaged property, the same as a large number of other growers, was appraised by parties appointed by agreement for that purpose. The Densley sheep were appraised at $15,379 for which, with some interest added aggregating $16,154.44, a mortgage on Densley's sheep was executed and turned over to the Portland Cattle Loan Company. This left a balance due on the Densley mortgage. There was a deficit to make up, that is, the difference between the appraised value of the sheep and the $20,988.70. The trustee J. T. Updike and his clerks and Miss Kivett, the secretary and manager for R. N. Stanfield, worked together from April 7 until the middle of June to ascertain the amounts of credit that should be allowed upon the different claims and the exact amount that was due from Densley over and above the appraised value of the sheep which were sold and which satisfied the mortgage thereon. The difference between the appraised value of the mortgaged property and the amount due from Densley was, with the other matters in like condition, called a "Stanfield equity." Some

wool and lambs had been sold by Densley in September and October, 1921, and wool in the spring of 1922 and the proceeds turned over to the Columbia Basin Wool Warehouse Company, but had not been formally credited to Densley until the matter of the adjustment was taken up after the agreement transferring the Stanfield assets which was made April 7, 1922.

The main contention of Mack is, and Stanfield makes a similar contention on his behalf, that there was no deficit that Densley owed over and above the appraised value of the sheep. To begin with, the time of the taking of the note by the trustee from Densley is in dispute, and respondent contends that the note was taken as late as February, 1923. That evidently was the time that a second mortgage was taken to secure the note, but the record shows that the note in question and a large number of other deficit or "Stanfield equity" notes were transferred and endorsed mostly without recourse by Stanfield about July, 1922, when Senator Stanfield came from Washington and endorsed all of these notes at one time. He states: "There was quite a mass of these notes. I believe it was in July—I forget the time I came to Weiser from Washington; I came out for that purpose; * * *" It would seem to us that Stanfield would know about the time of the transaction and it indicates that it was arranged when the matter was reasonably fresh in the minds of the interested parties. It is plain from the record that if the Densley sheep had been appraised at a sum sufficient to pay the $20,988.70, that amount then and there would have been paid to the Portland Cattle Loan Company for itself and the Columbia Basin Wool Warehouse Company, about which they had an agreement. The amount of the appraisal of

the sheep was not sufficient to satisfy that note and there was a deficit. This claim is based upon the contention that the lambs and wool of 1921 should be credited to Densley and if credited to Densley would reduce the amount below the appraised value of the sheep.

In our former opinion we assumed that it cost something to run the sheep during the time the lambs and wool were produced. We did not give the figure. The last time that Densley had renewed his obligations to Stanfield, prior to the agreement and turning over of the collateral, which turnover was dated June 1, 1922, was April 20, 1921. Between that time and June 1, 1922, when the transfers were dated, although the actual transfer might have been made at another date, as we find on page 176 of the transcript of testimony, from April 20, 1921, to June 1, 1922, at the date the statement closed, running expenses, advances and interest, as taken from a statement given by Miss Kivett for Stanfield, amounted to $22,501.03, which would more than offset the proceeds of the sale of the lambs and wool. Soon after the first Densley sheep were sold the trustee sold Densley a large number of other sheep and the Portland Cattle Loan Company financed him in running the same.

It is simply impossible to figure from the record that the Densley sheep, which were appraised, satisfied the Densley note and mortgage of $20,988.70.

In regard to this deficit note, Densley, as a witness for defendant Portland Cattle Loan Company, referring to the amount of the note in question, states: "It (the note) is made out to R. N. Stanfield. Well, I suppose it was for money that the upper office claimed; that was the money for which the sheep lacked

bringing when I sold them in 1922, I cleaned up in 1922.'' This statement, although not perfectly phrased, indicates plainly that Densley understood that the proceeds of the appraised sheep did not pay the note of $20,988.70. That note, as has been stated, was listed in Exhibit A to the trustee's agreement between the Portland Cattle Loan Company and Senator Stanfield. In that agreement, as well as relating to general matters, Mr. Stanfield states as follows: ''My liability to the holders of said notes (referring to the notes in Exhibits A and B to said agreement) for the R. N. S. face amounts thereof is not questioned.'' And yet Mr. Stanfield, in the interest of respondent Mack is now basing the claim principally upon the fact that that note was not all due to the Portland Cattle Company or to the Columbia Basin Wool Warehouse Company.

The deposit agreement under which the funds in question were deposited reads in part as follows:

''Contract made this 22d day of October, 1925, between Eagle Valley Sheep Company, a corporation, herein referred to as the Sheep Company, as first party, Portland Cattle Loan Company, Inc., a corporation, herein referred to as the Portland Company, as second party, and R. N. Stanfield, as third party;

''The Sheep Company is indebted to the Portland Company in the sum of $24,363.05, said indebtedness being secured by a first mortgage on certain sheep, and is also indebted to the Portland Company in the sum of $4,819.16, said last named amount being secured by a second mortgage on said sheep. The said Stanfield claims *that said last named indebtedness, $4,819.16, is payable to him for his account or for the account of certain other persons or corporations;* and an agreement has been made for the deposit of said sum, pending an agreement or judicial determination of the rights of the parties.'' (Italics ours.)

This statement not only shows that the sheep company, which was successor of J. W. Densley, was indebted to the Portland Cattle Loan Company for the amount of the first mortgage of $24,363.05 but also in the sum of $4,819.16, secured by a second mortgage, being the amount in controversy.

We again suggest that nowhere in this deposit agreement does Senator Stanfield mention or refer in any way to any claim of defendant Mack. It is very suggestive that Senator Stanfield, relying upon memory, had the idea that the appraised value of the Densley sheep was sufficient to liquidate the balance of the Columbia Basin Wool Warehouse Company note of $20,988.70, but this claim is not borne out by the record.

According to the claim of Mack and Stanfield, it would appear that Densley had executed more notes to Stanfield than he was owing, or, rather, more than he was owing after the proper credits had been given, and Stanfield had hypothecated the notes.

■■ In order for defendant Mack to prevail and have his note satisfied by the proceeds which the Portland Cattle Loan Company have been instrumental in producing by assisting Densley, it is incumbent on Mack to show that his note is superior in right to that of the Portland Cattle Loan Company. This he has not done. As we view it, Miss Kivett had no right to take or hold the so-called duplicate Mack note in the interest of Stanfield or Mack.

This is an equity suit, and it is for the court to determine with which party the equities are.

The testimony of Miss Kivett, page 104, shows that the schedule indicated the Columbia Basin Wool Warehouse Company received the proceeds of the sale of

the 1921 wool, which sum of money was credited to R. N. Stanfield and not credited to the growers on their paper at the time of the signing of the April 7 agreement. The Proceeds Account shows that John Densley on July 9, 1921, or three months after the signing of the $20,988.70 note, sold 1,099 lambs that netted $4,333.98; also on October 11, 1921, he sold 261 lambs, for a net of $1,154.86; that the Densley 1921 wool sale on January 23, 1922, amounted to $2,381.80, making a total of $7,870.64 that the Columbia Basin Wool Warehouse Company received to be credited to the John Densley note, that they did not credit at the time of the signing of the April 7 agreement, claiming that Densley's account at the time the trustee took it over, after allowing Densley these proper credits, was a little in excess of $13,000. Nevertheless, the statement of Miss Kivett, and the other testimony, shows that Miss Kivett and the bookkeepers for the trustee worked together from April 7 until the middle of June, checking up and ascertaining the credits to be given to different growers, among them J. W. Densley.

Referring now to pages 175 and 176, the testimony shows that in arriving at the balance of $13,698.64, due from Densley, the proceeds of the lambs and wool were credited to him. These figures are given by A. W. Douglas, referring to Miss Kivett's statement with corrections as to some errors and expenses, and as we understood the record the figures and the balance are unquestioned. Further than that, the record shows that from April 20, 1921, to June 1, 1922, the time the accounts were balanced, the running expenses for the Densley sheep were $12,946.80, together with advances and interest, making a total of $22,501.03.

In order for counsel for respondent to maintain the claim that the indebtedness due the Portland Cattle Company of $20,988.70 was reduced to the amount of the appraised value of the sheep, it would be necessary to credit Densley with the amount of the sales of lambs and wool, and say nothing about the running expenses, advances and interest. In other words, the calculation made by Miss Kivett and Mr. Douglas and the other clerk in the trustee's office was unquestioned at the time.

The claim of Stanfield is a mere afterthought. It is not supported by the record. There is no question of the amount due from J. W. Densley on the note of $4,819.16. The only controversy is in regard to the duplicate notes having been taken for this amount. As we mentioned in our former opinion, according to the general arrangement shown by the agreement of April 7, 1922, the Portland Cattle Loan Company financed Densley to continue the sheep business. After deducting the sale of the sheep which were appraised in June, 1922, together with some interest, amounting to $16,154.44, there was a balance due on the $20,988.70 note held by the Portland Cattle Loan Company, with interest to that time, of approximately $3,819.16. By virtue of the Portland Cattle Loan Company selling sheep to Densley and financing him to run them, it enabled him to pay his indebtedness, including the unsecured indebtedness. That evidently was their object. Stanfield made no objections. Mack had nothing to do with that transaction. Stanfield, by making the claim that the amount was due to him in the interests of some corporation, or person, and afterwards putting forward Mack as a claimant, is simply attempting to reap where he nor Mack has not sown. It would be in-

equitable to allow Mack the benefit derived from the conducting of this business from June, 1922, until 1925, even if his duplicate note were otherwise on an equal basis with the note of the Portland Cattle Loan Company in question. Evidently, as the difference between the appraised value of Densley's sheep and the amount of Densley's note transferred to the Portland Cattle Loan Company was termed a "Stanfield equity," Miss Kivett conceived the idea that such indebtedness belonged to Stanfield. After carefully reading the record, the briefs and figuring the amounts as carefully as possible therefrom, we are unable to reach such a conclusion. We fail to see how it is possible for counsel for respondent to claim that the sheep, lambs and wool were not credited to Densley. It is rendered easy to remember in regard to the figuring of the sheep as that was where Miss Kivett made an error of $1,000 in computing 1,540 sheep at $6,700 instead of $7,700, making the balance due from Densley $1,000 too large. While this error was called attention to by the clerk of the trustee and corrected without question, still it plainly shows that they were figuring the balance due from Densley and that he obtained proper credits. Moreover, the question of the extinguishment of the old indebtedness by the sale of the wool and lambs, so that the amount of Densley's indebtedness was reduced to less than the amount of the appraised value of the sheep, was not made an issue in this case by any of the pleadings or otherwise.

The trustee Mr. Updike and his clerks A. W. Douglas and E. F. Roy, appear to be competent business men, as well as his clerks being accurate accountants. We give their testimony fair credit.

It appears that defendant Mack took a second mortgage on the Densley sheep, but he seems to have paid no particular attention to it and has never attempted to enforce the mortgage.

The Cattle Loan Company is criticized by respondent for the reason that the bookkeeper of the trustee on October 3, 1923, made a statement of Densley's account in which the note of June 1, 1922, for $4,698.64 was not mentioned. The fact that a bookkeeper may not have made a full statement of the indebtedness would not pay that note. Necessarily they changed bookkeepers occasionally and there was a vast amount of detail for them to cope with. The money in question was undoubtedly due from J. W. Densley and the note representing the same was turned over to the cattle company as collateral security for the indebtedness of R. N. Stanfield. Thus Densley would receive credit for what he paid and Stanfield would receive credit upon the amount due the Portland Cattle Loan Company from him on the payment to the Portland Cattle Loan Company of the amount of the note in question.

It should perhaps be stated that about June, 1925, Densley incorporated the Eagle Valley Sheep Company and did business through that corporation. This company succeeded to Densley's sheep business. The Eagle Valley Sheep Company assumed and agreed to pay this Densley note. The note was executed for a valuable consideration and endorsed by R. N. Stanfield to the Portland Cattle Loan Company for a valuable consideration. The Portland Cattle Loan Company is a holder in due course of the Eagle Valley Sheep Company note.

Whatever claim defendant Mack may have he should look to R. N. Stanfield for satisfaction thereof.

The matter is rather lengthy to be described in all its details and to take up every phase referred to that might seem at first to be plausible. We have scrutinized the record and carefully read the testimony.

We adhere to our former opinion, and the decree of the circuit court is reversed and one will be entered in accordance herewith.

BAILEY, J., did not sit in this case.

————

KELLY, J. (dissenting.) As the writer views this case, the question to be determined is which defendant, the Portland Cattle Loan Company, hereinafter referred to as the Portland Company, or H. H. Mack, has the right to recover upon an admitted obligation originally due from John Densley to R. N. Stanfield.

This obligation is part of an indebtedness supposed to have been in the sum of $13,698.64, but later determined to be $12,698.64, which Densley owed to Stanfield. Three notes were executed by Densley therefor, one for $4,000, another for $5,000, and the third for $4,698.64. The one for $4,000 was discounted by the Bank of Stanfield, the one for $5,000 by the Bank of Echo, and the one for $4,698.64 was pledged to Mack as collateral security for a loan of $5,000. These three notes were duplicated. That is to say, Mr. Densley executed duplicates of each one of them. One set of these duplicates came into the possession of the trustee for the Portland Company. The Portland Company and Mack each claim to be entitled to recover on a renewal of the one of these three notes originally executed in the sum of $4,698.64.

552

There are at least six reasons why the writer thinks that Mack has the better right to a recovery:

■ Upon request of Miss Kivette, the Portland Company, through its trustee, returned to her two of the three purported notes held by it, namely, the one in the sum of $4,000, and the one for $5,000. The writer thinks that, if the Portland Company was entitled to one of them, it must have been entitled to all three, and that the converse is likewise true.

It is here that, basically, the views of the writer diverge from those reflected in the opinion of the court. The writer thinks that Mr. Stanfield was the owner of the obligations of growers which he took with the understanding that he would not accept mortgage security therefor until sometime after the execution and recording of mortgages securing the obligations discounted by and hypothecated with the Columbia Basin Wool Warehouse Company and the Portland Company. The writer thinks that there was no impropriety in discounting or hypothecating these obligations, for the payment of which the mortgages, if any were taken, were to be subject and subordinate to those taken by the two companies named, for funds procured by Mr. Stanfield from sources other than said two companies. Holding these views, the writer thinks that Mack, as well as the Bank of Echo and the Bank of Stanfield, acquired the right to insist upon payment by Mr. Densley.

■ No renewal of the purported note for $4,698.64, held by the Portland Company, was requested until the Densley interests were incorporated.

■ On October 3, 1923, a statement of Densley's account with the Portland Company was made by the trustee of the Portland Company and no reference whatever is made therein to the Densley note.

■ The report of the appraisers, under the trust agreement, discloses that on July 9, 1921, proceeds from a sale of Densley's lambs were received by the Portland Company in the sum of $4,333.98. On October 11, 1921, proceeds from a similar source were received in the sum of $1,154.86, and on January 23, 1922, proceeds from the sale of 1921 wool were received in the sum of $2,381.80. In June, 1922, The Stanfield Feeder Company purchased all the Densley sheep, and accounted to the Portland Company for the proceeds therefrom in the sum of $16,772. This reflects total credits to which Densley is entitled in the sum of $24,-642.64. These credits, which should be given Densley, are in excess of the $20,988.70 claim in the sum of $3,653.94.

Although, upon the trial, Miss Kivette testified concerning these credits, which were not given Densley, no testimony was offered by the Portland Company refuting or explaining them. It is argued that there must have been advances and that these advances offset the credits; but no testimony was offered as to the amount of any advances to Densley not charged to him, for which the Portland Company is entitled to such or any offset.

Miss Kivette testified that the Columbia Basin Wool Warehouse Company made advances to Mr. Densley in the aggregate sum of $3,718.02. If the Portland Company be given such an offset, then there would be a balance due it from Densley of only $64.08.

■ The explanation, in behalf of the Portland Company, to the effect that the $4,698.64 Densley note held by it represents the difference between the first mortgage executed by Densley to the Portland Company in July, 1922, for $16,154.44 and the item in the sum of

$20,988.70 appearing in the schedule attached to Exhibit E of the Portland Company is not convincing.

To the writer, Miss Kivette's explanation thereof makes the stronger appeal. She testified:

"That item of $20,988.70 was a note dated April 20, 1921 signed by John W. Densley secured by a first mortgage to R. N. Stanfield and this mortgage was rediscounted to the Columbia Basin Wool Warehouse Company on or about April 20, 1921 and from April 20, 1921 until June 1, 1922 John Densley did not renew his first mortgage on his sheep. The Columbia Basin Wool Warehouse Company kept that old note and during the year 1921, John (Densley) sold the sheep and sold the wool and turned the proceeds of this mortgaged property into the Columbia Basin Wool Warehouse Company, and the Columbia Basin Wool Warehouse Company instead of crediting the proceeds as turned in by John (Densley) they threw this money into an account they called the R. N. Stanfield Proceeds Account and credited Stanfield personally with the money and not John Densley."

■ Mack presents the record of the Densley account with Stanfield when he took the Densley note as collateral for the payment of money loaned to Stanfield and procured from a bank by Mack as shown by the records of the bank. There are no unexplained credits. The two notes executed by Densley contemporaneously with the one received by Mack and pledged by Miss Kivette for Stanfield have not been returned, but those two notes and the one Mack obtained were successively renewed, and two of them have been paid by Mr. Densley.

The writer thinks that the purported Densley note procured by the Portland Company came to that company by reason of a mistake or rather a series of mistakes. The taking of a mortgage by the trustee to

secure it is an incident which tends to convince the writer that the trustee had no actual knowledge of the Densley account because the mortgage was taken upon the Densley sheep which had been sold before the mortgage was executed.

A point is sought to be made because of a statement in the agreement, by the terms of which, the fund in suit was deposited with plaintiff, to the effect that the Eagle Valley Sheep Company was indebted to the Portland Company. Mack was not a party to this agreement and its recitals are not binding upon him. The Eagle Valley Sheep Company was a corporate alter ego of Densley, a fact of which the Portland Company was apprised when its note was substituted for the purported Densley note. In saying this, no reflection upon Mr. Densley is intended; but the substitution mentioned, in the opinion of the writer, created no superior equity in the Portland Company.

The writer thinks that the judgment and decree of the circuit court should be affirmed.