Argued January 9, remanded April 4, 1978

STAN WILEY, *Respondent,*
*v.*
BERG et al, *Appellants.*
(TC A-76-06-07838, SC 24802)
578 P2d 384

[ 10 ]

Michael Lee McDonough and William G. Paulus, of Paulus & Callaghan, Salem, argued the cause and filed the briefs for appellants Norman E. Berg and Riley Pleas.

No appearance for Housing Estate Corporation, appellant.

Peter C. Richter, of Miller, Anderson, Nash, Yerke & Wiener, Portland, argued the cause for respondent. With him on the brief were William B. Crow and

David C. Culpepper, of Miller, Anderson, Nash, Yerke & Wiener, Portland.

TONGUE, J.

**TONGUE, J.**

This is a suit in equity on behalf of unit owners of the Fontaine Condominium in Portland for a declaration of their rights under "option to purchase" provisions of subscription agreements signed by them and for a decree enjoining defendants from enforcing the provisions of an amended lease purporting to establish a minimum price for the exercise of the option.[1] Defendants appeal from an adverse decree.

As stated by defendants, "the question on appeal is whether the minimum purchase price contained in the amended lease is valid and binding on the members of the Fontaine Condominium Association." Defendants contend that this provision of the amended lease is valid and binding for two reasons: (1) "The terms of the amended lease superseded those of the original lease" (which did not include such a provision) and (2) "The terms of the subscription [signed prior to the amended lease] merged into the provisions of the unit owners' deeds." Before considering these contentions we must summarize the facts.

*Summary of the facts.*

Defendants Berg and Pleas (PB) purchased the Fontaine Apartments in 1970 at an FHA foreclosure sale. On August 10, 1971, they sold the building to defendant Housing Estate Corporation (HEC), a corporation organized by George Hansen, and leased to HEC the land on which the building was located. That original lease included the following provisions:

"3. *Option to Purchase.* The Fontaine Condominium Association (to be formed) hereinafter referred to as FCA may purchase said property on December 31, 1976, or on the 31st day of December every fifth year thereafter during the term hereof, the purchase price of the

---

[1]This suit is brought by plaintiff, manager of the Fontaine Condominium, "pursuant to ORS 91.635 [now ORS 91.578] on behalf of more than two unit owners of the Fontaine Condominium Association." For the purposes of this appeal defendants do not challenge plaintiff's right to bring this suit.

land to be determined by three (3) licensed appraisers; one selected by PB, one selected by FCA, and the third to be selected by the other two appraisers. * * *

"* * * * *

"Further, PB shall permit HEC to assign its interests as Lessee hereunder to an association of unit owners without impairing the option to purchase under paragraph 3.

"* * * * *."

A preliminary declaration of intent to organize a condominium was then filed by Mr. Hansen with the state real estate commissioner as then required by ORS 92.240, together with a copy of that lease, which was also recorded. Between September 1971 and June 30, 1972, HEC sold 42 of the 88 condominium units under "Subscription and Sales Agreements" which included the following provision:

"Every 5 years from the filing of the Declaration, the Condominium unit owners, by a 75 percent majority vote, may purchase the land at its value at that time, to be determined by three licensed land appraisers; one selected by the unit owners, one selected by the Lessor, and one selected by the aforementioned two appraisers."

Most of the unit purchasers were elderly persons.

A copy of that agreement was also filed with the state and a copy was delivered to defendants PB,[2] who were also told that HEC had sold condominium units and had received subscriptions from a number of persons who were kept informed of the progress of sales.

During June of 1972 Mr. Hansen proposed to PB various amendments to the lease, most of which were required by financial institutions as a condition for providing purchaser financing. Among the proposed amendments was a proposal that the term of the lease be extended from 75 to 100 years. In response, PB

---

[2]Mr. Hansen so testified. Mr. Berg first admitted and then denied receiving a copy of the subscription agreement.

proposed that the purchase option provide for a minimum purchase price of $380,000.

Mr. Hansen testified that he then believed that unless he agreed to the minimum purchase price PB would not sign the amended lease and that he needed to have it signed to avoid having to refund down payments received from purchasers. He also testified that he did not know at that time whether the land was worth $380,000, but that figure was "in the ball park" and that he thought it was reasonable. Mr. Berg testified that, in his opinion, the land would be worth $380,000 at the end of five years, when the option could first be exercised. Evidence was offered by plaintiff, however, that the land then had a value of $200,000.[3]

An amended lease was then executed on June 30, 1972, including a provision for a minimum purchase price of $380,000 upon exercise of the purchase option. It was recorded on July 25, 1972. On June 30, 1972, Mr. Hansen, acting as "chairman" of the Fontaine Condominium Association (FCA), also executed a "Declaration of the Fontaine Condominiums." That declaration, together with bylaws for the association, also dated June 30, 1972, were recorded on July 6, 1972, and was also filed with the state real estate commissioner. The trial court found, however, that the amended lease, although referred to in the declaration, was not filed with the real estate commisioner. Based upon our examination of the record we agree with that finding. On August 1, 1972, the amended lease, previously held by HEC pending organization of FCA, was assigned to FCA.

Based upon our examination of the record, we also agree with the finding by the trial court that no actual notice was given to condominium unit purchasers who had signed subscription and sales agreements prior to

---

[3]This evidence was not offered to establish the fair market value of the land, but to show the existence of a "justifiable controversy."

[ 13 ]

June 30, 1972, of this change in the amended lease providing for a minimum purchase price of $380,000 upon exercise of the option of the unit purchasers to purchase the land.

The trial court found that the addition of the provision for a $380,000 minimum price "substantially impairs the rights of those subscribers who executed subscription agreements prior to June 30, 1972." Based upon our examination of the record, we also agree with that finding.

After June 30, 1972, nine additional units were sold under the same subscription and sales agreements, which referred to the purchase option as provided by the original lease. Thirty-seven other units sold after June 30, 1972, were sold under earnest money receipts and contracts of sale which referred to a "lease" and made no specific reference to an option to purchase the land.

The first purchase closing occurred on July 28, 1972. Each unit purchaser, prior to closing his or her respective purchase, received and signed a copy of escrow instructions which referred to certain exceptions contained in a preliminary title report. Each title report listed as an exception the June 30, 1972, amended lease. Of the 42 unit purchasers who signed subscription contracts before June 30, 1972, 35 signed escrow instructions containing the phrase "read and approved" by "the undersigned." Of the nine purchasers who signed subscription contracts subsequent to June 30, 1972, each signed escrow instructions incorporating the phrase "read and approved" by "the undersigned."

After the purchase transactions were closed, all unit purchasers received deeds from HEC stating that they took their units subject to the June 30, 1972, declaration of the FCA. That declaration referred to the amended lease dated June 30, 1972.

*The amended lease did not cut off rights of purchasers who had previously signed subscription and sales agreements.*

Defendants' first contention is that the terms of the amended lease, with its provision for a $380,000 minimum purchase price, superseded those of the original lease, which included no such provision.[4] Although this may be true as between the parties to that lease, the question to be decided is whether purchasers of condominium units who had previously signed subscription and sales agreements which provided that the condominium unit owners "may purchase the land at its value at that time, to be determined by three licensed land appraisers * * *" acquired rights upon the signing of such agreements and, if so, whether such rights could be limited or otherwise impaired by that provision of the amended lease.

■ Despite defendants' contention to the contrary, the subscription and sales agreements were binding contracts. The subscribers agreed to purchase a designated unit for an agreed purchase price, with a down payment, with the balance to be paid "at time of conveyance." They became third party beneficiaries of the original lease, including the "option to purchase" by the Fontaine Condominium Association.[5] Although that association had not yet been formed, it was then contemplated by both parties to the lease, including defendants PB, that the association was to consist of all of the unit owners, as then provided by ORS 91.505(1).

■ Defendants contend, however, that:

"* * * According to the rule followed in most jurisdictions, the parties to a contract entered into for the

---

[4] HEC, although named as a defendant, filed no brief on this appeal. George Hansen was not named as a defendant.

[5] *Cf. Northwest Airlines v. Crosetti Bros.,* 258 Or 340, 345, 483 P2d 70 (1971), quoting with approval Restatement of Contracts 151-52, § 133 (1932). *See also* Restatement of Contracts 2d § 133, Tentative Draft No. 3 (1967).

[ 15 ]

benefit of a third person may rescind, vary, or abrogate the contract as they see fit, without the assent of the third person, at any time before the contract is accepted, adopted, or acted upon by him, and such rescission deprives a third person of any rights under or because of such contract. * * *"

In this case, however, the option provision of the original lease was "accepted, adopted, or acted upon" by the subscribers by the act of entering into the contract for purchase of a condominium unit under a written subscription agreement which made specific reference to the option to purchase. It follows that parties to the original lease could no longer "vary" the provisions of that option by inserting the requirement of a $380,000 minimum purchase price without the consent of the subscribers. *See also* Restatement of Contracts 168, § 142 (1932), and Restatement of Contracts 2d § 142 and Comment *g*, Tentative Draft No. 3 (1967).

■ Defendants would distinguish between the rights of the subscribers and those of FCA, which was not yet organized, and contend that "[t]he FCA did not at any time act upon, assent, or adopt the provisions of the first lease" and that the FCA, by its chairman, George Hansen, subsequently accepted the amended lease on June 30, 1972, and on August 1, 1972, also accepted an assignment of that amended lease, which he was entitled to do "under the general rule of law that the condominium developer can validly enter into contracts on behalf of the condominium association in its early stages after formation, even though the developer may be contracting with himself."

ORS 91.500(2) (formerly ORS 91.505(1)) defines "Association of unit owners" as "* * * all the unit owners acting as a group in accordance with the declaration and bylaws." The subscription agreement provided that "*the Condominium unit owners* * * * may purchase the land * * *."

Whatever may have been the authority of George Hansen to contract on behalf of FCA at that time, we

hold that the individual subscribers who signed the subscription contracts were the intended third party beneficiaries of the option provision of the original lease and that their rights as such were not cut off by that subsequent conduct by George Hansen. It follows, in our opinion, that the rights of the unit owners to exercise that option could not be "cut off" or limited by the imposition of the $380,000 minimum price provision, as provided by the amended lease, unless they consented to that limitation.

*The terms of the subscription agreements were not "merged" with the unit owners' deeds.*

Defendants contend that "[i]n the absence of fraud or mistake, and in the absence of collateral contractual provisions or agreements which are not intended to be merged into the deed, the acceptance of a deed tendered in performance of an agreement to convey merges the written or oral agreement to convey in the deed, the agreement to convey being discharged or modified as indicated by the deed * * *."

■ The following rule is stated in 6 Corbin on Contracts 313-14, § 1319 (1962):

"* * * Antecedent promises of a performance to be rendered subsequently to conveyance are not discharged by any so-called 'merger' [by the acceptance of a deed]; and the conveyance itself, being earlier in time than the performance to be rendered, is no accord and satisfaction. * * *"

This court has also adopted substantially the same rule. *See Van Hee v. Rickman et al,* 109 Or 357, 360-61, 220 P 143 (1923); *Cox v. Bowman et ux,* 213 Or 154, 160, 323 P2d 60 (1958). *See also Blake-McFall Co. v. Wilson,* 98 Or 626, 642, 193 P 902 (1921); *City of Bend v. Title & Trust Co.,* 134 Or 119, 127, 289 P 1044 (1930); *City of North Bend v. County of Coos,* 259 Or 147, 152, 485 P2d 1226 (1971). In our best judgment, that rule is applicable to the facts of this case.

Defendants also contend that because the amended lease had been recorded the unit purchasers had

[ 17 ]

constructive notice of its provisions; that because these unit purchasers signed escrow instructions which referred to title reports which, in turn, referred to the amended lease, they also were given constructive notice of the amended lease, and that because 44 of the escrow instructions included the phrase "read and approved," those who signed such escrow instructions had actual knowledge of the existence of the amended lease.

As previously stated, upon the execution of subscription agreements providing for the option to purchase, and prior to the minimum price provision of the amended lease, those unit purchasers acquired rights which could not be subsequently destroyed without their consent.

Although involving rights of a direct party to a contract, rather than those of a third party beneficiary, the rule applicable in such cases is stated in *Carnahan Mfg. Co. v. Beebe-Bowles Co.,* 80 Or 124, 156 P 584 (1916), as follows (at 128):

> "It was competent for the parties to modify their original contract which would amount to making a new agreement; but this later stipulation, like all others, must be one in which the minds of the parties meet on identically the same proposition. The record shows that the plaintiff proposed certain changes in the contract, but it does not show that the defendant accepted the offer. It was therefore error for the court to say to the jury:
>
> " 'That a modification of a contract submitted and taken under consideration must be answered. If it is not answered, it is agreed to.'
>
> "No one receiving an overture to change an agreement to which he is a party is obliged to answer the same. His silence cannot be construed as an acceptance if nothing else is shown. * * *"

*See also Voyt v. Bekins Moving & Storage,* 169 Or 30, 105, 119 P2d 586, 127 P2d 360 (1942); *Marnon v. Vaughan Motor Co., Inc.,* 184 Or 103, 158, 194 P2d 992 (1948); and *Suitter v. Thompson et ux,* 225 Or 614, 623, 358 P2d 267 (1961).

[ 18 ]

We believe this same rule to be properly applicable to cases such as this involving the question whether third party beneficiaries to a contract have consented to modify or surrender rights acquired by them as third party beneficiaries. As previously stated, these original subscribers had no actual knowledge of the provisions of the amended lease. It follows that constructive notice of the provisions of the amended lease was not sufficient to constitute such consent because consent required not only knowledge of the provisions of the amended lease, but the intent to modify or surrender the rights acquired under the terms of the original subscription agreement, and defendants did not prove that these unit purchasers had such an intent. Neither do we believe that the signing of "approval" of the escrow instructions was sufficient for that purpose, under the record in this case.

*The remedy in equity.*

The question remains whether the remedy as provided by the decree entered by the trial court was proper. By the terms of that decree, not only was the $380,000 minimum purchase provision of the amended lease held to be void, but it was held that "in the event the unit owners exercise the option to purchase, the value of the land shall be determined in accordance with the formula provided in the original lease."

Defendants say that this decree is improper for the following reason:

"* * * [I]f *each and every unit owner* who signed a subscription contract voted to purchase the property pursuant to terms of the subscription contract, they would comprise only a total of 57% of the total unit owner vote. Obviously, the unit owners who signed earnest moneys or contracts of sale would not be allowed to capitalize on the purchase option contained in subscription contracts. Therefore, it appears that, in any event, only 57% of the unit owners are qualified to vote on the purchase option. Since a majority vote of 75% is necessary to exercise the option, it appears that regardless of how the court decides the controversy, the unit

owners could not take advantage of the purchase option contained in the subscription contracts." (Emphasis theirs)

Thus, defendants contend that even if it be held that the unit purchasers who signed subscription agreements before the lease was amended have rights as third party beneficiaries, they are not entitled to a decree requiring defendants to sell the land for its market value, rather than for $380,000, the minimum price under the amended lease.

To accept defendants' argument would be to deny to these purchasers the only practical means of enforcing their rights as third party beneficiaries of the original lease. They could not expect to obtain the 75 percent vote necessary under the subscription agreements to exercise the market value purchase option if the other unit owners were held bound by the $380,000 mini- mum price provision, even on a pro rated basis. As a consequence, the value of their units, at least for the purpose of resale, would be substantially impaired.

As for the possible remedy of an action at law for damages, because of the contingencies involved any computation of the amount of damages in the impair- ment of the value of the condominium units would be difficult, if not speculative, even if a solvent defendant were available. HEC corporation, an original defend- ant, may be defunct. At least it has not joined in this appeal. As for the possible remedy of rescission, the unit purchasers who signed these subscription agree- ments, mostly elderly people, are apparently living in their apartments and have paid for them. Again, it does not appear that a solvent defendant is available for the return of their purchase money. In addition, they would be required to incur substantial additional expense in moving and in relocation.

■ These difficulties would have been avoided if the defendants had taken proper steps to make certain that the purchasers who signed subscription agree- ments were informed of the minimum price provision

of the amended lease before the closing of their purchase transactions, so that they could then decide whether to agree to that amendment to the lease or demand their money back at that time. This difficulty might also have been avoided had George Hansen, the promoter of the venture, filed the amended lease with the state real estate commissioner, as then required by ORS 91.545, 92.235 and 92.260. Under the terms of those statutes, it was required that the real estate commissioner be notified of "any material change" since the filing of the preliminary declaration, which had the original lease attached to it. The addition of the $380,000 minimum price provision was a "material change."

The trial court held that because the amended lease was not filed with the real estate commissioner, as required by law, this added provision was, for that reason, invalid and unenforceable. We are not prepared to hold at this time, however, that the failure to file a document such as an amended lease renders invalid any material changes in such a document, particularly in the absence of statutory provisions to that effect. We do hold, however, that both the failure of defendants to notify these unit purchasers of this change and the failure to file the amended lease with this change with the real estate commissioner are important factors for consideration in deciding, as a court of equity, what is an appropriate remedy in this case.

■ It is elementary that in a suit in equity, and under a complaint with a prayer for general relief, as in this case, a court of equity will determine with which party the equities are and may then shape a decree according to the equities of the case. *See Baker L. & T. Co. v. Portland Co.,* 141 Or 524, 546, 6 P2d 36, 18 P2d 599 (1931), and *Brooke et ux v. Amuchastegui et ux,* 226 Or 335, 341, 360 P2d 275 (1961).

■ We have already described the equities in favor of the unit purchasers who signed subscription agreements. As for the equities in favor of defendants, defendant HEC, even if not defunct, has not participated in this appeal. The equities in favor of defendants PB rest upon their claim to the benefit of the $380,000 minimum purchase provision of the amended lease. According to the testimony, their reason for demanding that provision, as an amendment to the provision for an option to purchase the land at its appraised market value, was the extension of the term of the lease from 75 to 100 years. It follows that if the option is exercised at this time (or at any time within 75 years) there can be no prejudice to PB as a result of that extension of the terms of the lease.

We believe that under the circumstances of this case, and considering the equities of all of the parties, the appropriate remedy is that a decree be entered to provide substantially as follows:

1. In the event that 75 percent of the unit owners should decide to exercise the option to purchase the land, they are entitled to purchase it at its market value, to be determined as provided in the original lease, and not subject to the $380,000 minimum price provision of the amended lease.

We recognize that, as a result, purchasers who did not sign the original subscription agreements may have the benefit of its provisions, but only by vote of 75 percent of the unit owners, whereas they would otherwise be entitled to exercise that option by simple majority vote of the unit owners, as provided in the bylaws of FCA, but subject to the $380,000 minimum price provision of the amended lease.

2. In the event that a majority (but not 75 percent) of the unit owners should decide to exercise the option to purchase the land subject to the $380,000 minimum price provision, as provided by the amended lease, they are entitled to do so under the provisions of the bylaws of FCA.

We recognize that, in such an event, purchasers under the original subscription agreements may become subject to the minimum price provision of the amended lease. We would expect, however, that before deciding whether to purchase the land at a minimum price of $380,000 the unit owners would acquire further information as to the market value of the land in relation to that "minimum price."

3. The time for notice of the first exercise of the option, as previously extended by the trial court from November 1, 1976, to December 1, 1976, is further extended to June 1, 1978.

4. In the event that the purchase option is not exercised prior to the expiration of the original lease and because, according to PB, the reason for their demand for the $380,000 minimum price was the extension of the term of the lease from 75 to 100 years, that minimum price provision shall become effective for all purposes at the expiration of 75 years in the event of any subsequent exercise of the option.

We recognize that there may be no direct precedent for the entry of such a decree, but that in doing so this court is proceeding as a court of equity to fashion a remedy which it deems to be necessary and appropriate under the circumstances of this case. As stated in 1 Pomeroy's Equity Jurisprudence 78, § 60 (5th ed 1941):

> "* * * [T]he Chancellor always has had, and always must have, a certain power and freedom of action, not possessed by the courts of law, of adapting the doctrines which he administers. He can extend those doctrines to new relations, and shape his remedies to new circumstances, if the relations and circumstances come within the principles of equity, where a court of law in analogous cases would be powerless to give any relief. In fact, there is no limit to the various forms and kinds of specific remedy which he may grant, adopted to novel conditions of right and obligation, which are constantly arising from the movements of society. * * *"

and (at 143-44, § 111):

"\* \* \* Equity has followed the true principle of contriving its remedies so that they shall correspond both to the primary right of the injured party, and to the wrong by which that right has been violated. It has, therefore, never placed any limits to the remedies which it can grant, either with respect to their substance, their form, or their extent; but has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed."[6]

We therefore remand this case for entry of a decree consistent with this opinion.

Remanded. Costs to plaintiff.

---

[6] As also said in *Bisno v. Sax,* 175 Cal App 2d 714, 346 P2d 814, 823 (1959):

"\* \* \* 'Equity does not wait upon precedent which exactly squares with the facts in controversy, but will assert itself in those situations where right and justice would be defeated but for its intervention.' *Times-Mirror Co. v. Superior Court,* 3 Cal2d 309, 331, 44 P.2d 547, 557 [1935]. In the same spirit it is said in *Wuest v. Wuest,* 53 Cal. App.2d 339, 346, 127 P.2d 934, 937 [1942]: 'Living as we do in a world of change, equitable remedies have necessarily and steadily been expanded to meet increasing complexities of such changing times, and no inflexible rule has been permitted to circumscribe the power of equity to do justice. As has been well said, equity has contrived its remedies "so that they shall correspond both to the primary right of the injured party, and to the wrong by which that right has been violated," and "has always preserved the elements of flexibility and expansiveness, so that the new ones may be invented, or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed." 1 Pom. Eq. Jur., 4th ed, p. 125, § 111.' \* \* \*."