531 So.2d 590 (1988)
James P. KNIGHT, Jr.
v.
Frank McCAIN, et ux.
No. 57880.
Supreme Court of Mississippi.
September 7, 1988.
*591 James T. Knight, Knight & Knight, Jackson, for appellant.
Michael Farrell, Jackson, M. Channing Powell, Gulfport, for appellee.
Before DAN M. LEE, P.J., and PRATHER and ROBERTSON, JJ.
PRATHER, Justice, for the Court:
This appeal arises from a suit by Frank and Denise McCain, the purchasers, for rescission of a deed, note and deed of trust on the ground that James P. Knight, Jr., the seller, breached a real estate contract to return their money if they could not get a building permit. The Chancery Court of Hinds County cancelled the deed, note, and deed of trust and granted plaintiffs a judgment for refund of the purchase price and other damages.
From this order, Knight appeals, and assigns the following as error:
(1) The chancery court erred in finding as a fact that appellant had adopted or became bound by a contract between appellees and the Johnsons.
(2) The chancery court erred in failing to apply the doctrine of merger to hold that a pre-existing agreement is merged into a deed and may no longer be separately enforced.
(3) The chancery court erred in granting equitable relief to appellees, particularly in view of the fact that any damages incurred by appellees were the results of their own actions or failures to act.
(4) The chancery court erred in granting of a contested preliminary injunction to appellees without a hearing.

I.
Of necessity, the recital of the facts of this case is lengthy and detailed.
On April 5, 1983, Hinds County had sued Ben Johnson for failing to develop Timberlake in accordance with Hinds County ordinances. Knight, who was Johnson's friend and attorney, represented Johnson in that litigation. The mandatory injunction, dated April 18, 1984, ordered Johnson to do all things necessary to bring Timberlake Place into compliance with the Hinds County Ordinance governing the subdivision of land. On appeal, this Court affirmed the chancellor. Johnson v. Hinds County, 524 So.2d 947 (Miss. 1988).
As a result of the litigation and other matters, Johnson became financially strapped. He borrowed $25,000 from Knight in return for a deed (as collateral) dated September 26, 1983 on the land. The deed was recorded on the land records of Hinds County on September 27, 1983. Knight acknowledged, without dispute, that the deed represented only collateral for the debt and that the land would be reconveyed to Johnson upon repayment. Knight borrowed the money from the bank and used the property transferred as security. The original note was for six months and was extended for an additional six months when Johnson was unable to repay Knight, but was finally paid off after a year by funds which Knight took from his personal profit sharing plan, now named Knight & Knight Retirement Trust. Knight stated that when Johnson was unable to repay the $25,000, Knight regarded the land as his property. He obviously did not have to foreclose anything because there was no deed of trust.
However, Knight operated under an oral understanding that Johnson could pay him off anytime and buy the land back for $25,000 plus interest. Johnson showed Knight three contracts and informed him that the down payment from the contract with the McCains, plus down payments on two additional sales contracts, would provide the necessary funds to repurchase the McCain property from Knight. Knight was aware that Johnson was marketing the property and specifically negotiating with the McCains.
In October, 1984, Frank and Denise McCain began to look for property on which to build a home. They contacted Ben Johnson in response to a newspaper advertisement of acreage for sale in rural Hinds County in an area commonly called Timberlake Place Subdivision. Timberlake is a large tract of land that Ben Johnson bought and from which he sold smaller *592 residential lots. The McCains made numerous trips to visit the property and to discuss terms. Johnson, who had built a home for himself in the subdivision, always advised the McCains that he owned the property. In November, 1984, the parties tentatively agreed on a price of $50,000 for a twelve acre tract of land. The McCains agreed to pay $10,000 down, and the Johnsons agreed to owner-finance the $40,000 balance. Johnson filled out the contract of purchase, and the McCains watched as both Mr. and Mrs. Johnson signed the contract. Johnson lined through the printed word "broker" on the contract form and inserted in the word "owner" under his name. At this time, a $500 check for earnest money was given to the Johnsons. The McCains were not certain if they signed the contract in November, 1984, or on February 13, 1985. The two couples became friends.
During the negotiations, the McCains advised Johnson that they had heard from relatives that there was a problem securing building permits on the property. Johnson then acknowledged certain problems with the County Board of Supervisors, but assured them that there would be no problem with the permit acquisition. Johnson guaranteed the McCains that if they encountered any problems, he "would refund all [their] money and it would not cost a dime to own the property." Johnson inserted the following provision into the contract: "In the event county does not issue building permit, all monies will be refunded."
Without dispute, the McCains signed the contract no later than February 13, 1985, on which date they gave Ben Johnson a check for $10,000 made payable to his lawyer, James P. Knight, Jr., as down payment. The McCains did not know why the check was made payable to Knight. Ben Johnson died four days later. After the funeral Mrs. Johnson found the check at her house and turned it over to Knight, her attorney. Mrs. Johnson then contacted the McCains and asked whether they were still interested in the land. When Mr. McCain said that they were, Mrs. Johnson replied that Knight would be getting in touch with him.
Knight contacted the McCains to sign the rest of the papers that had not been completed before Johnson's death. Denise McCain stated that Knight did not identify his connection with the property.
Knight used the sales contract to dictate a note, deed of trust and deed. The McCains went to Knight's office on March 5, 1985. While there, they noticed that the note called for monthly payments. Although the contract did call for monthly payments, the McCains told Knight that Johnson had agreed to change the provision to semi-annual payments. Knight agreed, and the provision was changed. At the same meeting, the McCains expressed some concern about obtaining a building permit. Knight recommended that they contact Jack Price, attorney for Hinds County, regarding the building permit. Knight also suggested that the McCains take the documents from his office and show them to their attorney. Knight never advised the McCains that he had no intention to be bound by the contract signed by Johnson as owner. The McCains took the documents with the intention of having them reviewed by an attorney. They wanted to show the documents to a friend who was an Internal Revenue Service attorney. They did not see the attorney, but did speak to him on the phone.
Knight then mailed the McCains copies of a new set of documents. The McCains took them back to Knight's office on April 5, 1985. Knight signed the deed, and the McCains signed the note and deed of trust. The McCains gave Knight a new check for $10,000 as the down payment and received their old check back.
The McCains believed that Knight was the attorney for Johnson's estate and that they were purchasing the property from the estate. The deed shows that the conveyance was from "James P. Knight, Jr., as nominee in title for Knight & Knight Retirement Trust." Mrs. McCain stated that they paid no attention to the name on the deed and did not actually know what it meant. She further stated that they had never bought land before, did not know anything about "legal stuff" and assumed *593 that Knight was handling the estate for Mrs. Johnson.
Eight months after the sale, Knight wrote the McCains, stating that "the contract for sale of this property required that the taxes be prorated for the year 1985 according to the length of time which each party owned the property during the year." Knight enclosed prorated taxes of $94.17 and advised the McCains that they were responsible for the balance.
There are approximately sixteen different land owners in the Timberlake area, all of whom can trace their original title back to Johnson's acquisition of the area in 1979. At least eight building permits have been granted to owners of property in the Timberlake area by the Hinds County Permit Department for the Hinds County Board of Supervisors, and at least seven houses presently exist in this area.
During February, 1986, Mrs. McCain heard from a relative, who had attended a Board of Supervisors meeting, that a problem with building permits on the Ben Johnson survey was publicly discussed. Mrs. McCain then called Mr. Gholson, with the Building and Permit Department, to inquire about the details. Mr. Gholson advised Mrs. McCain that they could not get a building permit for any property located in the Ben Johnson survey. McCain then called Knight about these developments. Knight still expressed confidence that they could get a building permit. McCain then asked Knight about the part of the contract stating that the McCains money would be refunded. Knight told her that if they could not get a building permit, he would refund the down payment and other principal payments, but not the interest. The McCains had made one installment payment shortly after it was due on September 15, 1985. Because they had an installment payment coming due March 15, 1986 and realized most of it would be unrefundable interest, Mrs. McCain testified that she felt it would be unwise on her part to make another payment and lose another $2,000 and then not be able to get the permit. When the McCains' second installment to Knight in the amount of $2,602.40 became overdue, Knight granted the McCains time to obtain a building permit and told Mrs. McCain that he had no intention of foreclosing on the property at that time.
Knight asked a local lawyer to assist in getting a building permit for the McCains. That lawyer wrote a letter to the Building Permit Department in which he stated that the McCains had purchased the property from Knight. Mrs. McCain testified that the McCains first knew of Knight's ownership at the time they received a copy of this letter. Gholson informed the lawyer that a formal application must be submitted to the Hinds County Building and Permit Department.
Knight offered to provide free legal assistance to the McCains in obtaining the building permit and agreed in writing to refund the down payment and payments of principal and to reimburse them for the cost of house plans up to $1,000. The McCains objected to Knight's refusal to refund interest payments because Johnson had told them that it wouldn't cost a dime to own the land, and they took him at his word and felt like all money should be refunded.
The McCains retained counsel, who demanded a repurchase of the property by the appellant pursuant to the provisions of the contract between the McCains and the Johnsons, and insisted upon an interpretation requiring repayment of all interest as well as principal paid by the McCains. Knight continued to offer to repurchase the property only for the principal balance paid by the McCains and only following an unsuccessful attempt to obtain a building permit, with Knight to have an opportunity to participate in the application process.
The McCains contacted Gholson's office about applying for a building permit, and Gholson replied that he would save them time and that there was no need to apply to his office because there is no central water supply system available on the property. Gholson suggested that they get in touch with their supervisor for assistance. Gholson's office followed up with a letter advising the McCains that they should contact the Board of Supervisors for a waiver of *594 the requirement to approve a well on the property in order to issue the building permit. Mrs. McCain then wrote George Smith, the President of the Hinds County Board of Supervisors, on July 29, asking for a waiver of the county ordinance that required a central water supply system on the property. Smith placed them on the agenda of the next Board meeting. On August 4, 1986, after an appearance by Gholson and the McCains, the Board voted unanimously to deny their request for a waiver. The Sanitation Department confirmed the denial advising them that "this office will have to deny approval of your property for private water well and individual sewage approval." These negotiations and communications with representatives of Hinds County were unknown to Knight. The McCains' inability to obtain a building permit marked the first time the Hinds County Board of Supervisors had ever denied a building permit to a landowner in the Timberlake area.
Knight testified that he became disgusted and started foreclosure proceedings at this point. His testimony reveals his belief that the McCains had continuously dragged their feet in the negotiation process while refusing to make the required payments under the installment note, that the McCains had ceased to negotiate in good faith and that they were going behind Knight's back and contrary to his request in having communications with the Building and Permit Department and the Board of Supervisors for the apparent purpose of bolstering their litigating position.
Faced with a foreclosure sale set for September 4, 1986, the McCains filed a complaint on August 27, 1986 for a breach of contract against James P. Knight, Jr. as trustee for Knight & Knight Retirement Trust asking for a refund of all monies paid, cancellation of the deed and note and attorney's fees. The McCains also moved the court for a preliminary injunction to prevent foreclosure sale. On September 2, 1986, the chancellor granted the McCains' motion for injunction preventing the foreclosure sale and required the McCains to post an injunction bond.
Knight filed his answer and a motion for summary judgment on September 12, 1986. He relied on two grounds: (1) that no agency existed between Johnson and himself; and, (2) that even if agency had existed the real estate sales contract had merged into the deed and was no longer applicable. The chancellor denied Knight's motion for directed verdict based upon the doctrine of merger and ruled for the McCains on the merits. The final judgment recited that the defendant was bound by the real estate contract which was breached when he refused to repurchase the land and refund all monies paid. The court awarded the McCains damages of $20,351.38 for amounts paid to Knight, taxes paid on the property, cost of title insurance, bulldozer work on the property, attorney's fees and prejudgment interest. The court cancelled the deed, the note and deed of trust and ordered that the title to the property be divested out of the McCains and vested in Knight. Final judgment was entered on September 25, 1986, from which Knight perfected his appeal.

II.

DID THE CHANCERY COURT ERR IN FINDING AS A FACT THAT KNIGHT HAD ADOPTED OR BECOME BOUND BY A CONTRACT BETWEEN THE MCCAINS AND THE JOHNSONS?

EVEN IF KNIGHT WAS BOUND BY THE CONTRACT, DID THE CHANCERY COURT ERR IN FAILING TO APPLY THE DOCTRINE OF MERGER TO HOLD THAT A PREEXISTING AGREEMENT IS MERGED INTO A DEED AND MAY NO LONGER BE SEPARATELY ENFORCED?
The above two assignments can be discussed jointly in light of the chancery court's finding, which was as follows:
I understand those decisions but this is a Court of equity and this contract that was entered into by the McCains and Mr. Johnson, I am going to take it that contract was really taken up by you, Mr. Knight, and while there is such a thing as a merger of a contract and the deed, when you sent the tax check of $94.17 to *595 Mr. and Mrs. McCain even then you referred to the contract. I realize that Mr. and Mrs. McCain should have been represented by an attorney in this entire matter. They didn't know you, of course, but they did know Mr. and Mrs. Johnson and felt like they could rely on him.
The doctrine of merger is firmly ingrained in Mississippi law. Previous negotiations or contracts are merged into a deed of conveyance. West v. Arrington, 183 So.2d 824, 827 (Miss. 1966); Brown v. King, 214 Miss. 437, 58 So.2d 922, 923 (1952). A general statement expresses the doctrine thusly: "that the acceptance of a deed tendered in the performance of a contract to convey land merges or extinguishes the covenants and stipulations contained in the contract... ." 77 Am.Jur.2d, Vendors & Purchasers, § 291 p. 450, (1975). See also, 8A Thompson on Real Property, § 458 (1963) p. 333, and 6 Corbin on Contracts, § 319 (1962), pp. 313-317.
By this appeal the appellant suggests to this Court that Mississippi has not adopted any exception to the above rule and that the chancery court committed reversible error in creating an exception.
However, the appellee suggests that under the majority rule, thirty-seven (37) jurisdictions hold collateral or independent agreements, which are to be performed subsequent to the conveyance, are not merged into the deed of conveyance.[1]
Eleven (11) jurisdictions, including Mississippi, have not addressed the issue of agreements collateral to or independent of the subsequent deed.[2] Three (3) jurisdictions have held that all agreements are merged into the deed.[3] The McCains urge this Court to follow the majority rule that a collateral agreement in a real estate sales *596 contract, not associated with questions of title, possession or quantity of land, survives the deed.
Our sister state of Alabama expresses their rule as follows:
It is declared that ordinarily, in the absence of fraud or mistake, when a contract to convey has been consummated by execution and delivery of a deed, the preliminary contract becomes functus officio, and the deed becomes the sole memorial of the agreement, and upon it the rights of the parties rest. But there are cases in which certain preliminary stipulations, such as are independent and collateral and not such preliminary agreement as would be merged in the conveyance, survive the deed and confer independent causes of action. Alger-Sullivan Lumber Co. v. Union Trust Co., et al, 207 Ala. 138, 142, 92 So. 254; Carter v. Beck, 40 Ala. 599; Frederick v. Youngblood, 19 Ala. 680, 54 Am.Dec. 209; 2 Devlin on Deeds (3d Ed.) § 850-b; 84 A.L.R. 1010, 1027, note. The purpose for which the conveyance is executed may be shown as illustrative of such exception. 2 Devlin on Deeds (3d Ed.) § 850-b; Donisthorpe v. Fremont, Elkhorn & Missouri Valley Railroad Company, 30 Neb. 142, 46 N.W. 240, 27 Am. St.Rep. 387.
Ridley, et al. v. Moyer, 230 Ala. 517, 161 So. 526, 528 (1935).
In our analysis of this question this Court considers this issue in two stages: (1) the exception of collateral agreements to the merger doctrine, and (2) the applicability of this particular agreement to Knight.
In the factual situation before us the buyers were purchasing the realty for construction of a residence. Based upon information that building permits could not be secured on this particular property, the McCains secured from Johnson an amendment to the contract, or an independent stipulation, that if a building permit could not be obtained their purchase price would be refunded. Since the purpose of buying this property was for residence construction, the inability to secure a building permit eliminates the purpose for which the conveyance was executed.
This Court has not addressed such an exception to the merger doctrine in prior cases, but is persuaded that a majority of jurisdictions have adopted the collateral agreement exception. Finding merit to the adoption of such an exception to the jurisprudence of this state, this Court now holds that Mississippi adopts the majority view that certain preliminary stipulations, such as are independent and collateral and not such preliminary agreement as would be merged in the conveyance, survive the deed and confer independent causes of action.
The instant case fits into the exception in every respect. This Court holds that the chancellor was correct in recognizing the collateral agreement exception to the merger doctrine under these facts.
The independent and collateral agreement was enforceable between the McCains and Johnson. Our discussion, however, cannot end here. This discussion must also answer whether Knight was bound by the terms of this contract as Johnson would have been.
Knight was aware of the marketing efforts of Johnson to sell this realty to the McCains and made no objection. He was also aware that Johnson was representing himself to be the owner although Knight had a recorded deed of record. As noted by the chancellor, the McCains unfortunately were not represented by an attorney through these negotiations. Even after Johnson's death, Knight made no representation to the McCains that he was the record title owner of the property.
The chancellor found as a fact that Knight adopted the contract of sale as his own by his actions. He tendered his portion of ad valorem taxes to the McCains as per the contract terms. Knight also represented that he would return the purchase price if, after applying for a building permit, they were denied one. The McCains did everything possible to secure a permit but actually apply; the only reason they did not actually apply for a permit was because they were told not to do so by the *597 building permit office because it would not be issued. The law does not require the doing of a futile act.
This Court agrees that the chancellor was correct in the finding that Knight adopted the sales contract as his own by his actions. Having done so, this Court holds that Knight is equitably estopped to deny the same.
This Court has expressed the standard of review by which a factual finding is reviewed in a similar case of equitable estoppel. In PMZ Oil Company v. Lucroy, 449 So.2d 201 (Miss. 1984), this Court stated:
Findings of fact made by a chancellor which are supported by credible evidence, or reasonable inferences which may be drawn from credible evidence, may not be set aside on appeal. Cotton v. McConnell, 435 So.2d 683, 685 (Miss. 1983); Culbreath v. Johnson, 427 So.2d 705, 707-708 (Miss. 1983). This is particularly true when, as here, we are concerned with a finding of fact substantially involving an individual's state of mind  we regard the question of whether the Lucroys relied to their detriment as essentially involving the question of what was in their minds when they constructed their home.
To be sure, the Chancellor never found specifically that the Lucroys relied upon the representations of PMZ/Pinkston regarding the protective covenants....
The failure of the Chancellor to make an express finding of detrimental reliance on the part of the Lucroys is by no means fatal. Such a finding necessarily had to be made for the Chancellor to reach the result he reached, considering the view of the law articulated in his opinion. Taking that opinion as a whole, this finding of fact is implied. Where there are issues of fact resolution of which is essential to the judgment but with respect to which the chancellor makes no specific finding, we are required by our prior decisions and by sound institutional considerations to proceed on the assumption that the chancellor resolved all such fact issues in favor of appellee. Harris v. Bailey Avenue Park, 202 Miss. 776, 791, 32 So.2d 689, 694 (1947); Cotton v. McConnell, 435 So.2d 683, 685 (Miss. 1983).
Id. at 205.
This Court finds this case to be applicable to the factual situation here and controlling. The chancellor's holding is affirmed binding Knight to the terms of the McCain/Johnson contract under the theory of equitable estoppel.

III.

SHOULD THIS COURT AWARD THE MCCAINS ATTORNEYS' FEES FOR SERVICES ON THIS APPEAL?
Attorneys' fees were awarded below, under a contractual provision so providing. This Court, having affirmed the judgment of the chancery court, entitles the McCains to attorneys' fees under the contract as awarded by the chancery court. Clow Corp. v. J.D. Mullican, Inc., 356 So.2d 579 (Miss. 1978); Morgan v. United States Fidelity & Guaranty Co., 191 So.2d 917, 924 (Miss. 1966). The judgment of the trial court included an award of $350.00 bulldozer work and pre-judgment interest of $1,364.57. These two items are not recoverable under the terms of the sales contract, and the chancery court is reversed as to those two items.
The Chancery Court is affirmed as to the money judgment for the down payment of $10,000.00, the first installment payment made on September 15, 1985, title insurance policy, and attorney's fees, together with interest at the legal rate from date of the trial court judgment and the imposition of the statutory fifteen percent penalty.
By separate motion, the appellee seeks an additional award of attorney's fee, which this Court sets at $1,500.00, together with interest at the legal rate from this date.
AFFIRMED IN PART; REVERSED AS TO BULLDOZER WORK DAMAGE AND PRE-JUDGMENT INTEREST. MOTION FOR ATTORNEY'S FEES ON APPEAL GRANTED IN THE AMOUNT OF $1,500.00.
AFFIRMED.
*598 ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., ROBERTSON, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
NOTES
[1] Ridley v. Moyer, 230 Ala. 517, 161 So. 526 (1935) (Independent and collateral agreements are not merged into the conveyance, survive the deed and confer independent causes of action.); Vaughey v. Thompson, 95 Ariz. 139, 387 P.2d 1019 (1963) ("[T]he rule of merger does not apply to those provisions of the antecedent contract which the parties do not intend to be incorporated in the deed or which are not necessarily performed by the delivery of the executed conveyance."); Christensen v. Slawter, 173 Cal. App.2d 325, 343 P.2d 341 (1959) ("Except where collateral matters are involved, a deed executed in consummation of an agreement between the parties merges all prior negotiations and agreements relating thereto ..."); Reed v. Dudley, 35 Colo. App. 420, 533 P.2d 507 (1975) ("The doctrine of merger cannot apply where the deed constitutes only part performance of the proceeding contract, and that the unperformed provisions of the contract do not merge into the deed."); Knight v. Breckheimer, 3 Conn. App. 487, 489 A.2d 1066 (1985) (Relying on Florida case that collateral agreements are not merged into the subsequent deed.); Allied Builders, Inc. v. Heffron, 397 A.2d 550 (Del. 1979); Haviland v. Dawson, 210 A.2d 551 (D.C. 1965); Opler v. Wynne, 402 So.2d 1309 (Fla. Dist. Ct. App. 1981); Worthey v. Holmes, 249 Ga. 104, 287 S.E.2d 9 (1982); Jolley v. Idaho Securities, Inc., 90 Idaho 373, 414 P.2d 879 (1966); Alton Banking & Trust Co. v. Schweitzer, 121 Ill. App.3d 629, 77 Ill.Dec. 246, 460 N.E.2d 105 (1984); Dubois County Machine Co. v. Blessinger, 149 Ind. App. 594, 274 N.E.2d 279 (1971); Phelan v. Peeters, 260 Iowa 1359, 152 N.W.2d 601 (1967); Webb v. Graham, 212 Kan. 364, 510 P.2d 1195 (Kan. 1973); Borden v. Litchford, 619 S.W.2d 715 (Ky. Ct. App. 1981); Talmadge v. West Orleans Beach Corporation, 18 La. App. 417, 137 So. 368 (1931); Wimmer v. Down East Properties, Inc., 406 A.2d 88 (Me. 1979); Dorsey v. Beads, 288 Md. 161, 416 A.2d 739 (1980); Pedersen v. Leahy, 397 Mass. 689, 493 N.E.2d 486 (1986); Greenspan v. Rehberg, 56 Mich. App. 310, 224 N.W.2d 67 (1974); Hutchens Bros., Inc. v. Brownsberger, 624 S.W.2d 538 (Mo. Ct. App. 1981); Caparrelli v. Rolling Greens, Inc., 39 N.J. 585, 190 A.2d 369 (1963); Kuzemchak v. Pitchford, 78 N.M. 378, 431 P.2d 756 (N.M. 1967); Yaksich v. Relocation Realty Service Corp., 89 Misc.2d 410, 391 N.Y.S.2d 822 (1977); Biggers v. Evangelist, 71 N.C. App. 35, 321 S.E.2d 524 (1984); Medeiros v. Guardian Title & Guar. Agcy., Inc., 57 Ohio App.2d 257, 387 N.E.2d 644 (1978); Griffin v. Bredouw, 420 P.2d 546 (Okla. 1966); Wiley v. Berg, 282 Or. 9, 578 P.2d 384 (1978); Carsek Corp. v. Stephen Schifter, Inc., 431 Pa. 550, 246 A.2d 365 (1968); Nelson v. Gregory County, 323 N.W.2d 139 (S.D. 1982); Haynes v. Morton, 32 Tenn. App. 251, 222 S.W.2d 389 (1949); Harris v. Rowe, 593 S.W.2d 303 (Tex. 1980); Stubbs v. Hemmert, 567 P.2d 168 (Utah 1977); Chimney Hill Owners' Ass'n, Inc. v. Atnignani, 136 Vt. 446, 392 A.2d 423 (1978); Miller v. Reynolds, 216 Va. 852, 223 S.E.2d 883 (1976); Black v. Evergreen Land Developers, Inc., 75 Wash.2d 241, 450 P.2d 470 (1969); Miles v. Mackle Bros., Div. Deltona Corp., 73 Wis.2d 84, 242 N.W.2d 247 (1976).
[2] Alaska, Arkansas, Hawaii, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, North Dakota, Wyoming.
[3] Russo v. Cedrone, 118 R.I. 549, 375 A.2d 906 (1977); Wilson v. Landstrom, 281 S.C. 260, 315 S.E.2d 130 (S.C. App. 1984); Wolfe v. Landers, 124 W. Va. 290, 20 S.E.2d 124 (1942).