# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-CA-00474-SCT

*DEBRA JOEL, AS EXECUTRIX OF THE ESTATE
OF JIMMY JOEL, LINDSEY MEADOR, AS
TRUSTEE FOR THE JAMES J. "JIMMY" JOEL,
TESTAMENTARY MARITAL TRUST AND AS
TRUSTEE FOR THE JAMES J. "JIMMY" JOEL
FAMILY TRUST*

*v.*

*JAMES H. JOEL AND ESTATE OF MARGARET
R. JOEL*


DATE OF JUDGMENT:            03/11/2009
TRIAL JUDGE:                 HON. WILLIAM G. WILLARD, JR.
COURT FROM WHICH APPEALED:   BOLIVAR COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANTS:    CHARLES EDWIN ROSS
                             KATHERINE A. HALL
                             WILLIAM B. LOVETT, JR.
ATTORNEY FOR APPELLEES:      GERALD H. JACKS
NATURE OF THE CASE:          CIVIL - WILLS, TRUSTS, AND ESTATES
DISPOSITION:                 AFFIRMED - 07/01/2010
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE CARLSON, P.J., DICKINSON AND PIERCE, JJ.

### DICKINSON, JUSTICE, FOR THE COURT:

¶1.    Jimmy Joel persuaded his elderly parents ("the Joels") to purchase a house from the

Shackelfords. Without the Joels' knowledge, Jimmy had his lawyer include in the deed a

provision that transferred title to himself upon the death of either of his parents. When the

Joels learned what Jimmy had done, they confronted him, and Jimmy agreed to remove the

provision. But before doing so, he unexpectedly died. Unable to persuade Jimmy's widow to change the deed, the Joels filed this suit to obtain fee-simple title.

¶2. In Mississippi, equity must follow the law. But where the law provides no remedy, equity may do so. Because the Joels had no contract with Jimmy, they had no legal remedy, so the chancellor imposed an equitable trust. We affirm.

## BACKGROUND FACTS AND PROCEEDINGS

¶3. Jimmy was a successful real estate developer, and his wife, Debbie, was a realtor. Jimmy built a small house and sold it to the Shackelfords for $93,500. In a verbal side-agreement, Jimmy promised the Shackelfords, according to Debbie, that if they ever wanted to sell the house, he would buy it back for what they paid plus $1,000. Two years later, they did decide to sell. But rather than repurchasing the house, Jimmy persuaded his parents to buy it.

¶4. After setting up financing through his banker, Jimmy instructed his attorney, Lindsey Meador, to include in his parents' deed a life-estate provision that transferred title to Jimmy upon the death of either of his parents. Even though the Joels had paid the full price for the home, and Jimmy had paid nothing, Jimmy's surviving parent would be left without title to the home.

¶5. In discussing the life-estate provision with his parents, Jimmy, according to Debbie, said the life-estate provision would protect them from losing the house to Medicaid. Mr. Joel, who was relatively unsophisticated in real estate matters, voiced concern about the life estate provision. He told Jimmy that he and his wife wanted to be sure they could pass the

2

house to their three children under the terms of their wills or, if they needed to, sell it. Jimmy assured them that they could.

¶6.     Also, Debbie and Jimmy, according to Debbie, worried that Jimmy's sister, Ann, might try to take advantage of her elderly parents; and Jimmy believed that the life-estate provision in the deed would give him control over whether Ann lived in the house.

¶7.     The closing took place in August 2001. The Joels admitted they did not read the deed, relying instead on Jimmy's assurances that all was as promised. With the proceeds from the sale of their old house, the Joels reduced their loan balance to an amount they were able to pay off within a few years. When Jimmy paid for some improvements to the house, the Joels tried to reimburse him, but he would not accept any money.

¶8.     According to Mr. Joel, the subject of the deed came up during a visit from their other son, Mike, in 2005 or 2006. Mrs. Joel said to him, "Son, I wish you'd get the papers out of that box in there and look at them and see if everything looks all right. We couldn't read that stuff. We don't really know." After reading the deed, Mike said it didn't look right to him, and that he wanted to take it to a real estate lawyer for review.

¶9.     Upon learning from the lawyer how the life-estate provision would work, the Joels became alarmed. Mr. Joel talked with Jimmy about the deed and told him, as he had before, that he wanted the house to pass to all three children according to his and Mrs. Joel's wills. He asked Jimmy to change the deed. Jimmy said he would, but in June 2007, he died unexpectedly of a heart attack. The deed remained unchanged.

3

¶10. Jimmy's will devised his property to two trusts, with his attorney, Meador, as trustee of both. Debbie was executrix of Jimmy's estate. Mr. Joel tried to get Debbie to change the deed, but she refused. On December 6, 2007, the Joels filed suit, seeking equitable relief including imposition of a constructive trust.

¶11. In their complaint, the Joels characterized the deed as a "mistake," claiming they thought they were taking title in fee simple. The complaint did not allege any wrongdoing such as fraud, overreaching, or undue influence, but instead alleged that Jimmy "agreed that his parents . . . were supposed to have fee simple title . . . ."

¶12. But when the Joels deposed Meador, they learned that Jimmy had met secretly with the attorney to dictate the terms of the deed. Then, with the court's permission (and over the Estate's objection), they abandoned the "mistake" theory and filed an amended complaint alleging that Jimmy had made false representations, knowing they would rely on his statements. The Joels also alleged that Jimmy had abused a confidential relationship with "substantial overreaching, and/or wrongdoing, and/or unconscionable conduct, and/or fraud."

¶13. Following a two-day trial, the chancellor imposed a constructive trust based on his Findings of Fact and Conclusions of Law ("FFCL"). He ordered that Mr. Joel[1] receive title to the house in fee simple. The Estate brings this appeal.

**STANDARD OF REVIEW**

---

[1] Mrs. Joel died before the trial.

4

¶14.    We do not review a trial court's findings of fact under the same standard used for its

conclusions of law.  When reviewing a chancellor's findings of fact, we

> will reverse a chancellor only where he is manifestly wrong.  A chancellor's findings will not be disturbed unless he was manifestly wrong, clearly erroneous or an erroneous legal standard was applied.  Where there is substantial evidence to support his findings, this Court is without the authority to disturb his conclusions, although it might have found otherwise as an original matter.[2]

¶15.    We recognize the following exception to the *Ferrara v. Walters* rule:

> Where the chancellor adopts, verbatim, findings of fact and conclusions of law prepared by a party to the litigation, this Court analyzes such findings with greater care, and the evidence is subjected to heightened scrutiny.  Because the chancellor erred in adopting[3] the litigant's findings of facts and conclusions of law in the case sub judice, the deference normally afforded a chancellor's findings of fact is lessened.[4]

¶16.    The FFCL proposed by the Joels and the one eventually entered by the court were

essentially the same.  So we must apply the *Brooks v. Brooks* heightened-scrutiny standard

of review.

¶17.    Heightened scrutiny requires that "the deference afforded the findings of fact is

lessened . . . ," and we " must view the challenged findings and the record as a whole 'with

---

[2] *Ferrara v. Walters*, 919 So. 2d 876, 880-81 (Miss. 2005) (*quoting In re Savell*, 876 So. 2d 308, 312 (Miss. 2004) (internal citations omitted)).

[3] The phrase "erred in adopting" should probably read simply "adopted," in light of the cases discussed in the Appendix, *infra*.

[4] *Brooks v. Brooks*, 652 So. 2d 1113, 1118 (Miss. 1995) (*citing Omni Bank v. United S. Bank*, 607 So. 2d 76, 83 (Miss. 1992); *In re Estate of Ford*, 552 So. 2d 1065, 1068 (Miss. 1989); *Rice Researchers, Inc. v. Hiter*, 512 So. 2d 1259, 1266 (Miss. 1987)).  For a discussion of the *Brooks* rule, please see the Appendix.

a more critical eye to ensure that the trial court has adequately performed its judicial function.'"[5]

¶18.    When we review conclusions of law, including the applicability of a constructive trust, we afford the trial judge no discretion.  Rather, we reach our own conclusions of the applicable law and how it should be applied.[6]

**ANALYSIS**

¶19.    The U.S. Supreme Court has stated:

The established rule, although not of universal application, is that equity follows the law or, as stated in ***Magniac v. Thomson***, 15 How. 299, "that, wherever the rights or the situation of parties are clearly defined and established by law, equity has no power to change or unsettle those rights or that situation, but in all such instances the maxim *'equitas sequitur legem'*[7] is strictly applicable."[8]

---

[5] ***In re Estate of Grubbs***, 753 So. 2d 1043, 1047 (Miss. 2000) (*quoting **Rice Researchers, Inc. v. Hiter***, 512 So. 2d 1259, 1265 (Miss. 1987).

[6] ***Davidson v. Davidson***, 667 So. 2d 616, 620 (Miss. 1995) (*citing **Planters Bank & Trust Co. v. Sklar***, 555 So. 2d 1024, 1034 (Miss. 1990); ***Shumpert v. Tanner***, 332 So. 2d 411, 412 (Miss. 1976);  ***Sojourner v. Sojourner***, 247 Miss. 342, 356, 153 So. 2d 803, 809 (1963); ***Allgood v. Allgood***, 473 So. 2d 416, 421 (Miss. 1985); ***Seymour v. Brunswick***, 655 So. 2d 892, 895 (Miss. 1995); ***Harrison County v. City of Gulfport***, 557 So. 2d 780, 784 (Miss. 1990)).

[7] Equity follows the law.

[8] ***Hedges v. Dixon County***, 150 U.S. 182, 192, 14 S. Ct. 71, 37 L. Ed. 1044 (1893).

¶20. In Mississippi, the law is the same — equity indeed must follow the law.[9] As we put it seventy years ago:

> The rule is that equity follows the law as far as the law goes in securing the rights of the parties and no further. When the law stops short of securing this object, equity continues the remedy until complete justice is done.[10]

We now turn to this case's central question of whether an equitable remedy was available to the Joels.

¶21. Although Jimmy arranged for the Shackelfords to sell the house to his parents, he was not a party to the sale. He neither bargained for nor paid for the benefit he arranged for himself in the deed. Neither party to the sale was accused of any wrongful conduct, so the Joels had no legal remedy, and the chancellor appropriately turned to equity.

---

[9] George D. Warner Jr., *Warner's Griffith Mississippi Chancery Practice* 48 (1991) ("Whatever may have been the course of action in the formative period of the law, courts of equity no longer assume to annul or directly disregard the positive provisions of the established law. Courts of equity are now bound by express rules of law concerning property and its interest . . . . Wherever the rights or duties of the parties in a given state of facts are definitely defined and established by law, statutory or common, equity must observe those rights and enforce those duties.").

[10] ***Senter v. Propst***, 190 Miss. 190, 197 So. 100, 104 (1940) (citation omitted). *See also* ***Daughtrey v. Daughtrey***, 474 So. 2d 598, 603 (Miss. 1985) ("The maxims of the chancery courts include two rules applicable here: 'equity follows the law' and 'to protect and enforce property rights is the object of equity.'") (citation omitted); ***Bowling v. Madison County Bd. of Supervisors***, 724 So. 2d 431, 434 (Miss. Ct. App. 1998) ("The more traditional analysis is that injunctive or other equitable relief . . . is unavailable if there exists an adequate remedy at law . . . .") (ellipses in original); ***Wilson v. Scruggs***, 371 F. Supp. 2d 837, 842 (S.D. Miss. 2005) ("[A]s a general proposition, equitable relief (a category which encompasses constructive trusts) is unavailable to a party who has an adequate remedy at law.") (parenthetical phrase in original).

¶22. We have held that "clear and convincing evidence is required to establish a constructive trust."[11] The estate has raised several challenges, each of which we must reject.

¶23. The Estate argues that, unless the chancellor found a confidential relationship, he was without authority to impose a constructive trust. While a confidential relationship is sometimes required, sometimes it is not. We have held:

> A constructive trust is one that arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.[12]

¶24. So a constructive trust is a proper remedy in a variety of circumstances. The *McNeil v. Hester* definition provides several examples of wrongful conduct that may justify imposition of a constructive trust:

(1) fraud, actual or constructive
(2) duress
(3) abuse of confidence
(4) commission of wrong
(5) any form of unconscionable conduct, artifice, concealment, or questionable means
(6) any way against equity and good conscience.[13]

---

[11] *Davidson*, 667 So. 2d at 620 (*citing Sklar*, 555 So. 2d at 1034; *Shumpert*, 332 So. 2d at 412; *Sojourner*, 247 Miss. at 356, 153 So. 2d at 809; *Allgood*, 473 So. 2d at 421).

[12] *McNeil v. Hester*, 753 So. 2d 1057, 1064 (Miss. 2000) (quoting *Saulsberry v. Saulsberry*, 223 Miss. 684, 690, 78 So. 2d 758, 760 (1955); citing *Alvarez v. Coleman*, 642 So. 2d 361, 367 (Miss. 1994); *Sklar*, 555 So. 2d at 1034; *Sojourner*, 153 So. 2d at 807).

[13] *Id.*

Any of the conduct, by itself, in this disjunctive[14] list will suffice. "Abuse of confidence" is on the list (#3), but it is only one of many avenues to a constructive trust.

¶25.    Although not required to do so, the chancellor found that Jimmy had breached a confidential relationship. We have stated:

> [T]he courts are careful not to limit the rule [that abuse of a confidential relationship is a ground for imposing a constructive trust] or the scope of its application by a narrow definition of fiduciary or confidential relationships protected by it. An abuse of confidence within the rule may be an abuse of either a technical fidiciary [*sic*] relationship or of an informal relationship where one person trusts in and relies upon another, whether the relation is a moral, social, domestic, or merely personal one. The origin of the confidence reposed is immaterial. A confidential relationship within the rule need involve neither a promise for the benefit of another nor an express fiduciary relationship.[15]

And nine years ago, we reaffirmed this view: "In harmony with the equitable purpose of constructive trusts, we are careful not to apply too narrow a definition of confidential relationship."[16]

¶26.    The chancellor found Jimmy and his parents were in a confidential relationship of the "moral, personal" variety. The record includes ample proof that Jimmy's parents relied on him to make all the arrangements for the purchase, and to explain to them what a life estate was. The chancellor found that, when Mr. Joel expressed concern that a life estate might prevent them from devising or selling the property, Jimmy misled his parents concerning the

---

[14] ***Id.***

[15] ***Saulsberry v. Saulsberry***, 223 Miss. 684, 690-91, 78 So. 2d 758, 760 (1955) (quoting 54 Am. Jur. *Trusts* § 225).

[16] ***Allred v. Fairchild***, 785 So. 2d 1064, 1068 (Miss. 2001).

9

legal effects of a life estate. Even though he knew that his parents wanted a title they could devise or sell, he secretly instructed his lawyer to draw up a deed with a life estate provision. The evidence amply supports the chancellor's finding that Jimmy abused a confidential relationship.

*The doctrine of unjust enrichment applies under the facts of this case.*

¶27. The trial judge also invoked the doctrine of unjust enrichment, which we have said "applies to situations where there is no legal contract but where the person sought to be charged is in possession of . . . property which in good conscience and justice he should not retain but should deliver to another . . . ."[17] He cited **Hans v. Hans** and **Saulsberry** as authority for imposing a constructive trust as an appropriate remedy for unjust enrichment. Then he listed the following seventeen findings of fact that "constitute *clear and convincing* proof which allows the Court to impose a constructive trust to prevent Jimmy's estate from being unjustly enriched" (emphasis added):

(1)    Jimmy suggested that his parents buy the house and sell their old one.

(2)    The parents bought the house, paying for it without assistance from Jimmy.

(3)    At Jimmy's suggestion, his parents agreed to the life-estate provision in the deed.

(4)    Jimmy told them that the life estate would not affect their ability to devise the property by will, or to sell it.

---

[17] **Hans v. Hans**, 482 So. 2d 1117, 1112 (Miss. 1986).

10

(5) The parents trusted and justifiably relied on Jimmy, who was sophisticated in real estate matters.

(6) The parents had wills that devised their home to their three children by representation.

(7) The home was the parents' only valuable asset.

(8) Jimmy instructed his attorney to draw up the deed; the parents were not involved.

(9) The deed, as dictated by Jimmy, granted his parents a life estate measured by the life of the first of the parents to die, with Jimmy as sole remainderman.

(10) Jimmy arranged the financing of the home and told the loan officer that his parents would own the home in their names; he did not mention the life estate.

(11) The parents did not agree to the "life estate as that term is legally defined." Their acquiescence was based on Jimmy's misrepresentations; Mr. Joel had told Jimmy that his parents wanted title that would permit them to sell the house or to devise it under the terms of their wills.

(12) The purchase of the house was the first time the parents had bought real estate with Jimmy's involvement; the first time Jimmy had handled all the arrangements for the financing and for the drafting of the deed; and the first time the parents had received anything other than fee simple.

(13) Jimmy did not contribute any money for the purchase.

(14) The parents paid the entire purchase price of nearly $100,000.00.

(15) The plaintiffs used the proceeds from the sale of their old house, which sale Jimmy handled, to pay for the new one.

(16) The value of the life estate, given the advanced ages of the parents, was far less than what they paid for it.

(17) Jimmy's conduct was "unconscionable" and "questionable."

11

¶28.    Trial testimony provides substantial evidence for these findings. The chancellor, who "has sole authority to determine the credibility of the witnesses,"[18] found Mr. Joel's testimony credible and in concert with other testimony. For example, the bank president testified he did not know about the life-estate provision and, had he known, he would not have made the loan; and Meador testified that Jimmy directed the drafting of the deed. This testimony constitutes the substantial evidence required to affirm the chancellor.

*Other theories may apply.*

¶29.    In addition to abuse of a confidential relationship and unjust enrichment, the FFCL detailed three other theories under which the chancellor imposed the constructive trust. Because we find more than adequate support for the chancellor's ruling in the two theories discussed above, we decline to address the others. We now turn to the other issues the Estate raised on appeal.

> *The chancellor did not err in adopting, verbatim, findings of fact and conclusions of law submitted by the Joels.*

¶30.    The estate argues the chancellor erred in adopting the plaintiffs' FFCL. Although such adoption does trigger heightened-scrutiny review of the chancellor's findings of fact,[19] it does not invalidate them.[20]

---

[18] ***Bell v. Parker***, 563 So. 2d 594, 596 (Miss. 1990).

[19] ***Rice Researchers, Inc. v. Hiter***, 512 So. 2d 1259, 1266 (Miss. 1987); *see also* Appendix to this opinion.

[20] ***Brooks v. Brooks***, 652 So. 2d 1113, 1118 (Miss. 1995).

¶31. Even under the heightened-scrutiny standard, "this Court must determine whether, based on substantial evidence, the Chancery Court was manifestly wrong in [its findings] . . . ,"[21] and even under this standard, the chancellor is the one who evaluates the credibility of the witnesses.[22]

¶32. Here, as in *Rice Researchers v Hiter*, the chancellor's findings easily withstand even heightened scrutiny. The chancellor carefully conducted a two-day trial, during which he listened attentively, and after which he deliberated independently. He requested proposed FFCLs from both sides; he did not consider the plaintiffs' proposal alone. Examining the chancellor's "findings with greater care,"[23] we find "'that the trial court has adequately performed its judicial function.'"[24]

*The chancellor did not err in allowing the plaintiffs to amend their complaint.*

¶33. Leave to amend a complaint is a matter of discretion for the trial court.[25] In *Estes v. Starnes*, this Court quoted with approval and adopted the United States Supreme Court's interpretation of the federal counterpart to our rule on amendments:

> Rule 15 . . . declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded[.] . . . [I]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he

---

[21] *Rice Researchers*, 512 So. 2d at 1268.

[22] *Id.* at 1265.

[23] *Brooks*, 652 So. 2d at 1118.

[24] *In re Estate of Grubbs*, 753 So. 2d 1043, 1047 (Miss. 2000).

[25] *Estes v. Starnes*, 732 So. 2d 251, 252 (Miss. 1999).

13

ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant[;] repeated failure to cure deficiencies by amendments previously allowed[;] undue prejudice to the opposing party by virtue of allowance of the amendment[;] futility of the amendment, etc. — the leave sought should, as the rules require, be "freely given."[26]

¶34. The Joels sought leave to amend their complaint after learning new facts during Meador's deposition. The Estate did not establish any of the reasons listed in *Estes* for denying a motion to amend. The chancellor did not abuse his discretion.

*The chancellor did not err by not dismissing the case on statute-of-limitations grounds.*

¶35. The statute of limitations on a constructive-trust claim is ten years.[27] That period will expire in 2011, ten years after the Joels entered into a contract with the Shackelfords to buy the house. And the Joels filed suit before 2011, so their claim is not barred by the statute of limitations.

*The chancellor did not err by not dismissing the case under the doctrine of laches.*

¶36. We take this opportunity to clear up the confusion in some of our past cases regarding the applicability of the doctrine of laches. When a claim is subject to a statute of limitations, the defense of laches is not available. There are several reasons why this is so.

---

[26] *Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)).

[27] *See, e.g.,* *Allred v. Fairchild*, 785 So. 2d 1064, 1070 (Miss. 2001) ("Section 15-1-39 imposes a 10-year limit on actions seeking or concerning trusts . . . .").

¶37. First, historically, medieval courts created the doctrine of laches for situations when no statute provided a limitation period.[28]

¶38. Second, the doctrine of separation of powers, embodied in Article 1 of the Mississippi Constitution,[29] requires that when the Legislature has created a cause of action and prescribed a limitations period for it, the judicially created doctrine of laches cannot override that law. As the U.S. Supreme Court put it, "If Congress explicitly puts a limit upon the time for enforcing a right which it created, there is an end of the matter. The Congressional statute of limitation is definitive."[30]

¶39. Finally, this Court has often stated that the doctrine of laches does not apply where a claim has not yet been barred by the applicable statute of limitations.[31] In today's case, the

_____

[28] Kathryn E. Fort, *The New Laches: Creating Title Where None Existed*, 16 Geo. Mason L. Rev. 357, 368 (2009) (*citing* **Gascelyn v. Rivere**, 4 Edward II (1311)) ("The doctrine was used as early as 1311 in a property inheritance dispute."). Fort states that "[e]quity, as defined by Blackstone, had rules [including] the fact that laches generally did not bar a suit if brought within the period set by the applicable statute of limitations." *Id.* at 369. Other scholars note that "[l]aches may have existed in Roman law, though this is not certain." Uisdean R. Vass & Xia Chen, *The Admiralty Doctrine of Laches*, 53 La. L. Rev. 495, 497 (1992).

[29] Miss. Const. art. 1, §§ 1, 2.

[30] **Holmberg v. Armbrecht**, 327 U.S. 392, 395, 66 S. Ct. 582, 584 (1946).

[31] **Miss. Dep't of Human Servs. v. Molden**, 644 So. 2d 1230, 1232 (Miss. 1994). **Molden** quoted **Greenlee v. Mitchell**, 607 So. 2d 97, 111 (Miss. 1992), and cited **West End Corp. v. Royals**, 450 So. 2d 420, 425 (Miss. 1984), for this proposition. **Greenlee** relied on **West End Corp.** and **Bolden v. Gatewood**, 250 Miss. 93, 119, 164 So. 2d 721, 732 (1964). **Bolden** cited **Continental Oil Co. v. Walker**, 238 Miss. 21, 34, 117 So. 2d 333, 337-38 (1960), for the rule that "mere delay short of the statutory period of limitations does not itself bar relief; that laches in a legal sense is not merely delay, but delay that results in injustice or disadvantage to another." **Continental Oil**, in turn, cited **Hill v. Nash**, 73 Miss. 849, 19 So. 707, 710 (1896), in which the appellant argued that because the lawsuit was filed four days before the expiration of the ten-year statute of limitations ran, "a court of equity, in the exercise of its own inherent powers, independently of the statute of

15

ten-year statute of limitations applies, making any consideration of the doctrine of laches irrelevant.

*The chancellor did not err in giving the Joels fee-simple title.*

¶40.    The Estate argues that the Joels should not have fee-simple title because they "bargained for a life estate" and "knew they were purchasing a life estate." The chancellor did not so find.

¶41.    The Estate also asserts that the Joels "wanted to keep the house in a life estate with the only change being to the remainderman language in the Deed." The only evidence for that contention was the testimony of Debbie and her sons, to which the chancellor declined to give weight. But the court found credibility in Mr. Joel's testimony that he had been trying for years to get what he originally had requested — title in fee simple. Weighing the credibility of witness testimony is the chancellor's proper role and duty.[32] This Court will not disturb the chancery court's findings under these circumstances.

*The chancellor did not err in denying the Estate's counterclaim and in finding that the true value of the house was $94,500.*

¶42.    In its answer, the Estate asserted a counterclaim seeking relief on two grounds: first, that Jimmy had contributed $20,500 in the form of equity toward the purchase of the house;

---

limitations, may and should refuse relief, on the ground of discouraging stale claims, or gross laches, or unexplained acquiescence in the assertion of an adverse right." The **Hill** Court rejected that argument, stating that "it has been decided that there is no such thing as a stale claim, properly so called, in this state; and, by positive law, the statute of limitations is to be applied in our courts of equity as in our courts of law. With us, no claim is barred until the limitation of the statute has accrued."

[32] ***Bell v. Parker***, 563 So. 2d 594, 596 (Miss. 1990).

16

and second, that Jimmy had made $8,000 in improvements to the property without being reimbursed by his parents.

¶43. The first ground is based on the Estate's theory that (1) the house, at the time the elder Joels bought it, was worth $115,000 rather than the $94,500 that they paid; and that (2) Jimmy had an agreement with the Shackelfords, the couple who bought the house from Jimmy in 1999, to buy the house back from them for $94,500. According to the Estate, Jimmy could have bought the property from the Shackelfords at the lower figure and sold it for the higher. Instead, he allowed his parents to buy the house from the Shackelfords for $94,500 and get the benefit of the buyback agreement. According to that reasoning, Jimmy thereby gave $20,500 in equity to his parents.

¶44. This argument fails for several reasons. First, the appraiser testified that he arrived at the higher value only by ignoring the fact that the house had actually sold for the lower figure. He did so because he thought the sale was a familial transaction. In fact, it was not. The Joels bought the house from the previous owners, the Shackelfords. The appraiser also testified that "the definition of market value" is what a willing seller will take from a willing buyer. In this instance, that figure was $94,500.

¶45. Second, even if the house had appreciated more than twenty-one percent in value in two years, the alleged agreement, never written down, is a nullity under the statute of frauds. The only evidence for its existence was the testimony of Jimmy's widow, Debbie.

¶46. Also, that evidence violated the parol evidence rule. The 1999 contract between the Shackelfords and Jimmy did not mention the alleged buyback provision. Debbie's testimony

17

concerning oral discussions was parol evidence, admissible only where the terms of a contract are ambiguous.[33] Jimmy and the Shackelfords entered into a simple, unambiguous real estate contract that contained no buyback provision. In fact, it contained a warranty clause that mentioned nothing about Jimmy having any right or obligation to repurchase the property. The warranty clause concluded with, "No further warranty is given."

¶47. Finally, even if the buyback agreement had been within the collateral-agreement exception to the parol-evidence rule,[34] the exception applies only to matters that one would not reasonably expect to be merged into the final written contract.[35] It is reasonable to expect the parties to memorialize such an important contract provision.

¶48. We find that substantial evidence supported the chancellor's conclusion that Jimmy did not contribute $20,500 in equity to his parents. And as for the improvements, the evidence shows that the Joels repeatedly tried to pay Jimmy for them, and he repeatedly refused. The chancellor found that "the improvements . . . were made with no provision by Jimmy that he expected re-payment [*sic*] or because he would own the home as soon as one of them died." His finding that the improvements were gifts was reasonable, especially considering Debbie's testimony that the new glass patio doors and their installation were a gift from Jimmy to his parents, as was the money to pay for several years of insurance premiums. The chancellor did not err in dismissing the counterclaims.

---

[33] *Lambert v. Miss. Limestone Corp.*, 405 So. 2d 131, 133 (Miss. 1981).

[34] *See* *Knight v. McCain*, 531 So. 2d 590, 596 (Miss. 1988).

[35] *Id.*

## CONCLUSION

¶49.    The chancellor correctly found that Jimmy's estate was holding the Joels' property in a constructive trust, and that equity required that title in fee simple be conveyed to Mr. Joel.

¶50.    **AFFIRMED**.

**WALLER, C.J., CARLSON, P.J., RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR. GRAVES, P.J., NOT PARTICIPATING.**

**APPENDIX**

¶51. The Estate asserts, incorrectly, that ***Brooks v. Brooks***[36] stands for the proposition that when a chancery court adopts and incorporates, verbatim, a litigant's proposed findings of facts and conclusions of law, those findings must be reviewed de novo.

¶52. In ***Brooks***, a divorce case involving allegations of adultery, the chancellor applied an incorrect legal standard, which triggered de novo review. Instead of the proper "clear and convincing evidence" standard, the chancellor used the lesser standard of "a preponderance of the evidence."[37] The chancellor adopted the proposed findings of fact and conclusions of law submitted by one of the parties, including the erroneous statement of the legal standard.[38]

¶53. A trial judge is permitted to adopt a party's proposed findings. As Justice Robertson colorfully explained,

> In our view, the matter of whether a trial court may adopt verbatim, in whole or in part, the findings of fact and conclusions of law of a party is within the court's sound discretion. Case complexities and crushing caseloads necessitate substantial reliance upon the submissions of trial counsel. Still, the judge is a judge and not a rubber stamp. He may not be able to afford the luxury of practicing his culinary art a la the Cordon Bleu. He should remember, however, that his oath precludes a McDonald's approach to the judicial process.[39]

---

[36] ***Brooks v. Brooks***, 652 So. 2d 1113 (Miss. 1995).

[37] ***Id.*** at 1116.

[38] ***Id.*** at 1118.

[39] ***Rice Researchers, Inc. v. Hiter***, 512 So. 2d 1259, 1266 (Miss. 1987) (internal citation omitted).

¶54.    This Court commented on this issue fairly recently, noting that

> [i]t is hardly uncommon and certainly altogether appropriate for our overworked and understaffed trial judges to make a request similar to the one made by the trial judge in this case — request that each party's attorney send a proposed findings of fact and conclusions of law (FOFCOL) to facilitate the trial judge's ultimate entry of an opinion and order/judgment. Certainly, with today's computer technology, disks can also be sent (as was requested by the trial judge in this case). Upon receipt of these disks with the proposed FOFCOL, a trial judge and the judge's law clerk/staff attorney can then "cut and paste" into an opinion which is indeed the original work product of the trial judge, albeit containing perhaps verbatim portions of the proposed FOFCOL submitted by the respective attorneys. The only caveat we have issued to our trial judges when utilizing this method of generating an opinion is that if it appears to this Court on appeal that a trial judge has adopted verbatim the proposed FOFCOL submitted by one of the parties, by and through counsel, we will stray from our deferential treatment of a trial judge's findings of fact and instead apply a heightened scrutiny or de novo review.[40]

¶55.    Neither *City of Belmont* nor any other case we have found supports the idea that de novo review is proper under these circumstances. Perhaps the opinion mentioned de novo review because it involved an appeal of summary judgment, which would have been reviewed de novo in any event. Whatever the explanation, that statement in *City of Greenville* is in error.

---

[40] *City of Greenville v. Jones*, 925 So. 2d 106, 116 (Miss. 2006) (*citing* *City of Belmont v. Miss. State Tax Comm'n*, 860 So. 2d 289, 293-95 (Miss. 2003)).